Exhibit A



March 4, 2024


Brandon T. Byers, Esq.
Office of the City Attorney
City of Daytona Beach
301 S. Ridgewood Ave.
Daytona Beach, FL 32114

Bruce R. Bogan, Esq.
Hilyard, Bogan & Palmer, P.A.
105 E. Robinson Street, Suite 201
Orlando, FL 32801-1622


RE:    Kary Jarvis v. City of Daytona Beach, Florida's et al. Case No.: :23-cv-508-PGB-RMN


Dear Messrs. Byers and Bogan:

The following is my report in this matter which incorporates rebuttal to Plaintiff's expert, Mr.

Tiderington, regarding the materials sent to me in the above styled case. My opinions in this case are

based in part upon a careful review of the documents furnished to me by your office listed in Appendix A.

I have attached my fees policy as Appendix B and my current CV as Appendix C. During the past four

years I have testified at several depositions, hearings, and trials at the state and federal court level. These

are noted in Appendix D.

The analysis is based upon those documents and the current practices and professional standards

of law enforcement. The review of said materials, my assessment, and my report are based upon my

knowledge of law enforcement and investigative practices combined with my education, training,

experience, and my ongoing research and teaching of law enforcement issues, policies, and practices to

practitioners, academy recruits, and university students over several decades.

**Qualifications**

I began my career as a law enforcement officer in 1979 in the State of Florida. I have been continuously training law enforcement and corrections officers in various topics since 1980. I specifically taught law enforcement defensive tactics and the use of force in the Florida Basic Recruit Training Programs (academy) for more than thirty-five years. I have specifically taught patrol and arrest procedures and practices for more than thirty-five years to law enforcement academy recruits, in-service law enforcement officers, and college students. I have specifically conducted use of force training in these roles. I have conducted training as a patrol practices instructor in two regional and one agency law enforcement academies over a thirty-five-year period. I have taught police procedure courses at the college and university level since 1989.

I have published peer-reviewed journal articles on topics including policies addressing, and the dynamics of, patrol procedures and the use of force. I have constructed and collaborated on policies for patrol personnel, and the use of force in criminal justice, and I have reviewed hundreds of such policies. I have been retained as an expert in state and federal courts in cases involving the training of law enforcement in patrol procedures, use of force events and law enforcement practices. I have been retained as an expert in cases involving the training of law enforcement officers, and specifically in patrol practices, investigations, and the use of force, and the agency policies and procedures addressing such matters.

During CALEA accreditation of one Florida sheriff's office, I was the SME for the Patrol, Investigations, and Narcotics Divisions. This entailed my writing of the policies and procedures for patrol practices. I routinely review the force usage policies and practices of law enforcement agencies in my role as an academic researcher, and police practices expert. With a co-author, I conducted and published a comprehensive survey and analysis of law enforcement use of force policies in Florida. Also, with a co-

author, I conducted and published a comprehensive survey and analysis of law enforcement complex investigation policies in Florida.

I have taught use of force methods for law enforcement and corrections for more than thirty-five years. I was chief defensive tactics instructor for two Florida sheriff's offices. This training specifically includes the use of physical control techniques and less-lethal weapons such as the ASP and TASER. I am the author of the textbook *The Use of Force in Criminal Justice*. I have specifically utilized law enforcement defensive tactics and arrested both resistant and cooperative individuals as an officer, performed defensive tactics and handcuffing, and I have trained and supervised the training of hundreds of officers in such practices. I have specifically constructed and collaborated on policies for arrests and the use of force, and I have reviewed such policies from across the U.S. I recently served on the Electronic Control Weapon (ECW) Working Group of the International Association of Chiefs of Police (IACP) Policy Center, revising the nationwide model policy on devices such as the TASER.

I have published peer-reviewed journal articles on topics including policies addressing, and the dynamics of, patrol procedures and the investigation of crime. I have constructed and collaborated on policies for patrol personnel, and the use of investigative methods in criminal justice, and I have reviewed hundreds of such policies. I have been retained as an expert in state and federal courts in cases involving the training of law enforcement in patrol procedures, investigative events and law enforcement practices. I have been retained as an expert in cases involving the training of law enforcement officers, and specifically in patrol practices and investigations, and the agency policies and procedures addressing such matters.

I have specifically taught and trained academy recruits in law enforcement and corrections, in-service officers, and university students on Communicating in Law Enforcement; Communicating in a Diverse Society; Human and Cultural Diversity; Conducting Professional Stops; Taking Custody of the Suspect; Responding as Backup; Disorderly Behavior; and Disorderly or Irate People. I created and taught the university courses *The Use of Force in Criminal Justice; Police Use of Force and Intersectionality*;

*Violence*, and others. In addition, the courses I teach on *Policing*, *Corrections*, *Juvenile Justice*, *Criminal Investigations*, and others, incorporate aspects of agencies and officers interacting with the public they serve, and the prevention, intervention, and the investigation, arrest and force usage within a democratic society vis-à-vis law enforcement. I am the author of the textbook *Criminal Investigations Today: The Essentials*. Regarding policy and management issues in criminal justice, I teach graduate courses that include *Criminal Justice Policy,* and *Criminal Justice Management*.

I specifically have taught the training blocks, among others, on the Elements of Crimes, and Interview and Interrogation in the Florida Law Enforcement Basic Recruit Training Academy, as well as the 40-hour Interview and Interrogation Commission Advanced Training Program, and the 80-hour Defensive Tactics Instructor Commission Specialized Instructor Training Program Course. I am a member of the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the Justice Research and Statistics Association (JRSA), the National Tactical Officers Association (NTOA), and the International Law Enforcement Education and Training Association (ILEETA), among others. In addition to law enforcement and corrections academy training, my university courses for more than thirty years have incorporated the dynamics of interactions during interviews, investigations, and impaired-person arrest events. In my expert witness work I have been retained in cases involving patrol, use of deadly force, and use of force training and practices.

I have specifically conducted internal/professional standards investigations, I have supervised employees in the conduct of such investigations, and I have reviewed such investigations as a command-level officer. I am certified as an internal affairs investigator, and I am a member of the National Internal Affairs Investigators Association. In my various supervisory and command roles during my career I have specifically administered and approved counseling, training, and discipline up to and including termination for employees. I am a Senior Certified Professional (SHRM-SCP), by the Society for Human Resources Management and I am an active member of the SHRM. I also have a certification in Personnel Background Screening and Vetting (PBSV). I have taught the graduate course Human Resources

Management for Public Organizations, and principles and practices of hiring, training, retention, and separate of public employees are topics within several of the classes I teach.

**Methodology**

In case analysis, as a consultant, I utilize recommended national standards, model policies, handbooks, and guides put forth by various professional organizations such as the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the National Sheriffs Association (NSA), National Tactical Officers Association (NTOA), the Commission on the Accreditation of Law Enforcement Agencies (CALEA), American Jail Association (AJA), and others. I am a member of a number of these organizations. I have been a member of the International Association of Chiefs of Police (IACP) for more than thirty years, was a member of that body's Education and Training Committee for several years. I am a member of the Criminal Investigations Resource Network based in the U.K. and I have served as a member of the Education and Training Committee of the IACP, staff of the International Law Enforcement and Education Training Association (ILEETA), and as research advisor to *Calibre Press*, the national training group, and I developed the teaching ancillaries for their text, *Street Survival II*, the influential police practices book. I routinely refer to published reports and research of these and other organizations as part of my case review and analysis.

As an academician and forensic criminologist with more than thirty years of teaching police policies, procedures, and practices, my analyses are further informed by the national and international bodies of literature from peer-reviewed academic journals, as well as government sources such as the Bureau of Justice Statistics, National Institute of Justice, National Highway Traffic Safety Administration, National Criminal Justice Reference Service, the Government Accountability Office, the Congressional Research Service Reports, and others. My own authorship of peer-reviewed academic journal articles, and textbooks, on criminal justice topics are components of my subject matter expertise. I am one of two

American academics named as International Ambassador of the British Society of Criminology (BSC). In the Fall of 2019, I lectured throughout the U.K. on the use of force by police, and American police major case investigative methods.

My experience as a former officer, investigator, supervisor, command-level administrator, director of law enforcement and corrections academies, director of law enforcement, chief of training, together with my experience training officers over the past forty years, combine to provide substantive experience to support my qualifications to conduct such reviews and analyses. Each of these qualifications, and all these together, provide me with a broad knowledge of generally accepted practices and procedures, which I apply to analyze whether the facts in a case fall above or below those standards, articulate such standards, and explain to a jury or court how they apply to the facts in a specific case.

My methodology in reviews is to list all case materials, an initial fact scenario- not fact finding nor credibility judgement- and to provide opinions comparing specific case facts to accepted practices, never legal conclusions nor personal opinions. As a professor teaching criminal justice and public policy, I am aware of the importance of social science research to the outcome of many such public and criminal justice policies. The empirical research methods- quantitative, qualitative, or mixed- provide useful information that can be explained to jurors. This research is open inquiry, rigorously tested (peer-review), and reported publicly for further scrutiny. I have served (and continue to) as editorial (peer) reviewer for numerous academic journals, and I sit on the editorial board of the journals *Psychology and Behavioral Sciences,* and *Homicide Studies*. I was guest editor of a special edition of this journal focused on the investigation of homicide. Review of science, like the testimony of an expert, must be the product of reliable principles and methods.

To the extent that police work as a vocation has been examined by social science researchers and criminologists routinely since only the 1970s, the research and observations are scholarly, and employ all the rigor of peer-review. The past fifty years have demonstrated the general acceptance within the social

science community of the methods and theories developed. The body of scientific knowledge that I draw upon and focus through my qualifications to apply and explain, is well established.

**Additional Materials**

I may amend my opinions and supplement my report as necessary based upon additional information furnished to me as well as my own research and further analysis of case factors. Some facts in this case may be disputed and I attempt to identify this while incorporating them and undisputed facts in my own case analysis. I have conducted case analysis and been proffered as an expert witness in criminal justice practices in state and federal courts since 1991. My qualifications to conduct case analysis, draw conclusions and render expert opinions such as the ones in this report are based on my personal and professional knowledge, education, specialized training, and ongoing research and teaching in these areas.

**Issue Summary**

In the analysis of an event, there is typically inconsistency in some statements among involved individuals. This may result from perception, intoxication, emotion, or other factors. An expert witness provides analysis and observations without assigning credibility to one person or another, as that is a responsibility for jurors. The following initial information from the official reports and records is utilized for purposes of analysis in this matter:

> On Friday, October 23, 2020, at 4:50 PM, Officers were dispatched to 1500 Virginia Avenue, the Virginia Avenue Apartments, in reference to a possible narcotics-related suspicious vehicle backed into a parking lot. The officers were advised that people kept going in and out of the vehicle and walking back and forth to one of the apartment units.[1] The apartments at this location are known for criminal activity.[2] Mr. Jarvis had committed a traffic violation, and his vehicle matched the description of a possible narcotics transaction. To investigate the possible drug

---

[1] CAD Detailed History for Police Event #P202971961
[2] Deposition of Officer Mackenzie

crime(s), officers were dispatched to 1500 Virginia Avenue. Officer Tucker (ID# D53583) went to the location and observed a vehicle matching the description leaving the area driving west on Adeline Street. Officer Tucker, in his marked patrol car, turned and followed the blue Mitsubishi into the RaceTrac parking lot. The driver, later identified as Kary Jarvis, was observed by Officer Tucker to go into store and then come back out and pump gas. Officer Tucker observed Kary Jarvis drive the blue Mitsubishi out of the RaceTrac parking lot onto South Ridgewood Avenue without coming to a stop at the stop bar in the parking lot. Officer Tucker was able to initiate a traffic stop of the blue Mitsubishi.

While following Mr. Jarvis, prior to initiating the traffic stop, Officer Tucker observed the driver (Jarvis) to be making "furtive movement" around the area of the console and steering wheel of the car he was driving. After initiating the stop, Officer Tucker issued Mr. Jarvis a warning citation for the violation and then asked Mr. Jarvis if he and Officer Mackenzie could search the car. Mr. Jarvis refused the search. Officer Mackenzie explained to Mr. Jarvis that because of his furtive movements the officers suspected he concealed a weapon or drugs, and that "per case law" officers could search the area of the movements. Mr. Jarvis stepped out of the car, taking only one or two steps but remaining at the driver's door saying he wanted to watch. Officer Tucker told him that he could watch. Both officers continued to professionally explain the circumstances to Mr. Jarvis. When told to stand back from the car, Mr. Jarvis got back into his car. The officers ordered Jarvis out of the car, but he refused. The two officers attempted to stop Jarvis by reaching for the subject's left arm. This is viewable on the AXON video. Mr. Jarvis is then heard to say "Fuck ya'll" as he put the vehicle in drive and accelerated away while the two officers were holding on to the vehicle.

The progressing drug investigation transitioned at this moment to aggravated assault/battery of law enforcement officers. While the two police officers were being dragged, Jarvis lost control of the vehicle, eventually crashing into a retention ditch. Kary Jarvis was placed under arrest, transported to Halifax Medical Center to be medically evaluated, released from there and transported to jail.

An inventory search of the vehicle located two rocks of a white substance that presumptively tested positive for Heroin/Fentanyl. The weight was 5.6 grams. Also located were:

- A white scraper with white powdery substance in a wooden box was located under the driver side front seat;
- Two scales with a white powdery substance was located in the center console;
- A "Gucci" brand bag was hanging from the head rest of the front passenger side seat containing numerous clear baggies;
- A black suitcase style bag was located in rear passenger right seat containing a black plastic sealer;
- A blue vape pen was discovered in the vehicle which was tested using a test multi drug test kit. Which came presumptive positive for THC Oil; and
- Numerous knives were located in the center console of the vehicle readily available to the defendant.

**Discussion**

Identifying and responding to crime in the community are among the more frequent functions of a community's officers. Community members expect their officers to proactively investigate individuals, locations and circumstances where crime may be occurring, including potential illegal drug transactions, such as the instant case.[3] Drug and attendant crime is a priority of the public, the community leaders, and therefore its police agencies.

**Environment**

For the last twenty years, Daytona Beach, Florida has had a crime rate consistently, and significantly, higher than surrounding communities, the State of Florida, and the United States (Figures 1 & 2).[4] The rate has averaged more than double the U.S. rate since 2003 (Figure 3).[5] The City is depicted in colors representing degrees of dangerousness by aggregators for crime in Daytona Beach,[6] though much of the urban area is graded "dangerous" (Figure 4).[7]



*Figure 1*

---

[3] Incident reports 200018358
[4] City-Data.com
[5] Ibid.
[6] https://www.neighborhoodscout.com/fl/daytona-beach/crime
[7] Ibid. Orlando Metro Total Violent Crime Map

| Type | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Murders** (per 100,000) | 8 (12.9) | 0 (12.9) | 9 (14.5) | 3 (4.9) | 3 (4.9) | 4 (6.5) | 4 (6.4) | 4 (6.4) | 10 (15.7) | 9 (13.7) | 12 (17.9) | 8 (11.9) | 13 (19.8) | 14 (20.6) |
| **Rapes** (per 100,000) | 46 (74.7) | 30 (47.1) | 38 (59.7) | 31 (50.8) | 37 (59.8) | 23 (37.2) | 57 (91.4) | 69 (110.2) | 52 (81.8) | 26 (39.5) | 23 (34.5) | 17 (25.4) | 18 (25.9) | 25 (33.7) |
| **Robberies** (per 100,000) | 323 (602.5) | 362 (568.5) | 290 (481.3) | 229 (378.4) | 236 (381.7) | 179 (289.4) | 195 (312.5) | 153 (244.3) | 150 (231.5) | 94 (140.5) | 94 (121.4) | 91 (131.5) | 109 (158.1) | 77 (109.6) |
| **Assaults** (per 100,000) | 604 (1,005) | 595 (934.6) | 636 (992.6) | 548 (898.3) | 559 (904.0) | 506 (822.2) | 543 (870.9) | 576 (922.9) | 779 (1,227) | 625 (1,045) | 631 (933.8) | 648 (938.7) | 654 (938.5) | 609 (869.5) |
| **Burglaries** (per 100,000) | 1,172 (1,825) | 1,851 (1,891) | 1,023 (1,592) | 1,683 (1,775) | 994 (1,807) | 796 (1,292) | 745 (1,184) | 628 (1,005) | 556 (873.9) | 572 (873.1) | 497 (735.8) | 384 (558.3) | 380 (544.1) | 274 (389.5) |
| **Thefts** (per 100,000) | 2,873 (4,473) | 3,131 (4,925) | 3,148 (4,888) | 3,069 (5,094) | 2,898 (4,585) | 2,724 (4,422) | 2,942 (4,696) | 2,992 (4,777) | 3,226 (5,085) | 3,234 (4,935) | 3,027 (4,480) | 2,750 (3,994) | 2,213 (3,166) | 1,666 (2,383) |
| **Auto thefts** (per 100,000) | 567 (882.7) | 462 (725.9) | 523 (812.8) | 463 (756.0) | 375 (608.4) | 346 (559.2) | 367 (586.3) | 358 (585.2) | 398 (628.7) | 391 (597.0) | 295 (430.6) | 224 (323.8) | 240 (343.7) | 203 (288.2) |
| **Arson** (per 100,000) | 12 (15.7) | 10 (15.7) | 12 (18.7) | 16 (26.2) | 12 (19.4) | 5 (8.1) | 4 (6.4) | 1 (0.0) | 7 (0.0) | 7 (10.7) | 4 (5.9) | 7 (10) | 10 (14.3) | 16 (22.0) |
| **City-Data.com crime index** | 825.7 | 790.9 | 781.8 | 790.3 | 791.4 | 665.3 | 671.2 | 665.3 | 728.4 | 817.9 | 551.8 | 494.4 | 464.3 | 421.9 |

↑ - means the value is bigger than the state average. ↑↑ Average is 294.0. It adjusts for the number of visitors and daily workers commuting into cities.
↑ - means the value is bigger than the state average.
↑↑ - means the value is much bigger than the state average.

*Figure 2*



*Figure 3*



*Figure 4*



*Figure 5*



Data Source: Federal Bureau of Investigation - Crime in the U.S.

MLA Citation: <a href='https://www.macrotrends.net/cities/us/fl/daytona-beach/crime-rate-statistics'>Dayto

*Figure 6*

The community in which police interact with citizens has clear implications for the responses by

government agencies and individual employees in their varying roles in the justice system. What may not

be frequent, or routine, in one community, may be all too common in another (Figure 5),[8] (Figure 6).[9]

What police do matters in the broad attempt to curtail violent crime.[10]  The reduction of crime and social

disorder is generally favored by citizens.[11] As to safety for Daytona Beach Police Officers, There are

nearly 400,000,000 firearms in the United States.[12] This number is far higher than the number of people in

this country.[13] This number represents licensed or manufactured and purchased guns – it does not include

"ghost guns" produced by unlicensed manufacturers. While Mr. Jarvis was not found to have a firearm,

when he was finally stopped, this is the context of policing in Daytona Beach, Florida. A police officer

must be aware that someone may have a firearm, and that when they move into an area where the officer

---

[8] [Daytona Beach Crime Rates and Statistics - NeighborhoodScout](#)
[9] Daytona Beach FL Crime Rate 1999-2018, https://www.macrotrends.net/cities/us/fl/daytona-beach/crime-rate-statistics
[10] GROFF, E. R., RATCLIFFE, J. H., HABERMAN, C. P., SORG, E. T., JOYCE, N. M., & TAYLOR, R. B. (2015). DOES
WHAT POLICE DO AT HOT SPOTS MATTER? THE PHILADELPHIA POLICING TACTICS
EXPERIMENT. *Criminology (Beverly Hills)*, *53*(1), 23–53. https://doi.org/10.1111/1745-9125.12055
[11] Haberman, C. P., Groff, E. R., Ratcliffe, J. H., & Sorg, E. T. (2016). Satisfaction With Police in Violent Crime Hot Spots:
Using Community Surveys as a Guide for Selecting Hot Spots Policing Tactics. *Crime and Delinquency*, *62*(4), 525–557.
https://doi.org/10.1177/0011128713516840
[12] United States Bureau of Alcohol, Tobacco, Firearms and Explosives, Resource Center, Data & Statistics, 2022
[13] United States Census Bureau, 2022

cannot see objects or the subject's hands (car interior), the subject may obatin a firearm. A person is not stopping when ordered to, and then turning and get back into their car, are indicators the person is trying to get away. The trained and experienced officer is aware that people move toward weapons and escape. Suddenly, the weapon is a 3300-pound SUV.

The Florida state accrediting body, the Commission for Florida Law Enforcement Accreditation, Inc. (CFA),[14] provides standards to address field operations and the investigation of crime. The International Association of Chiefs of Police (IACP) and other professional, non-profit, and government organizations have devoted a great deal of resources to combating drug trafficking, illegal drug use, drug abuse, and ancillary crimes.

In addition to the training received by all Florida certified officers during the Basic Recruit Academy, other professional organizations provide guidelines and model standards to address field operations and the policies and practices of law enforcement agencies.[15] The International Association of Chiefs of Police (IACP), the Florida Commission on Accreditation of Law Enforcement, Inc., the Police Executive Research Forum (PERF) and other professional, non-profit, and government organizations have devoted a great deal of resources to guidance on addressing drug crime, and proper arrest procedures by officers.

The Daytona Beach Police Department is accredited agency by the Commission for Florida Law Enforcement Accreditation, Inc. (CFA). The independent review certifies that a law enforcement organization meets prescribed standards in the field. Key in the lengthy process to pursue accreditation is the development and maintenance of the policies and procedures that guide agency members. The Daytona Beach Police Department has been reaccredited multiple times for its ongoing commitment to excellence demonstrated through its operations, documentation of efforts, and review by external independent authority.[16]

---

[14] Chapter 7, Chapter 15
[15] https://calea.org/ https://flaccreditation.org/
[16] Commission for Florida Law Enforcement Accreditation, Inc.

Neither the Commission for Florida Law Enforcement Accreditation, Inc., nor any other body that promulgates standards or comments upon police practices dictates specific methods that local agencies must employ to conduct lawful field and investigative operations. In fact, none of the entities I cite express a view that pretextual traffic stops, and questioning is improper for criminal drug investigations. Use of legal and available methods, including such stops and investigating, to gather evidence of potential criminal activity is decided by the involved investigators based on the information and resources they have available.

The arrest affidavit is guided by the legal requirement to establish probable cause of a crime that has occurred, is occurring, or may occur, for review by a neutral magistrate of the jurisdiction. The arrest report in this matter incorporated the types of elements officers are taught in the basic academy constitute probable cause in various arrest situations. Once again, the Commission for Florida Law Enforcement Accreditation, Inc. (CFA) requires that accredited agencies have a directive that specifies procedures related to arrests. The Daytona Beach Police Department has such arrest policies.

While body-worn cameras (BWC) by police have been *available* for some time, wide-spread use of video recording, and other issues illuminated by their use seem relevant. Agency actions may be viewed as accountable and legitimate when reviewable video and other evidence is available. This is the case in this matter. Such video availability in select police actions is not required by law. In 2018 the U.S. Bureau of Justice Statistics reported that only 47% of general purpose law enforcement agencies were fully utilizing body-worn cameras.[17] As a best practice, the Daytona Beach Police Department has chosen to utilize the BWV tool, and the named Defendant officers utilized video[18] in their interaction with Kary Jarvis, fully aware of its ability to be reviewed later.

---

[17] National Institute of Justice, "Research on Body-Worn Cameras and Law Enforcement," January 7, 2022, nij.ojp.gov
[18] CODB Departmental Standards Directive 904 Mobile Video Recorder

**Law, Policies, and Training**

Among the roles of officers in Florida and elsewhere is to respond to the use and abuse of drugs.

Officers and members of the Daytona Beach Police Department assist, inquire and investigate various

matters as expected by the citizens of Daytona Beach, Florida. Identifying and responding to drug crime

and hazards in the community is an important function of that community's officers. Once alerted to the

potential presence of a suspected drug situation, officers followed routine practice of making an

investigation, arrest and seizing the substance. Daytona Beach is within the Central Florida High Intensity

Drug Trafficking Area designated by the Office of National Drug Control Policy.[19]

In Florida, several hundred police agencies formulate policies for their specific community and

jurisdiction. None of the organizations that I cite express a view that the use of an on-scene arrest is

improper for a potential drug crime, nor that use of force may be necessary. Use of legal and available

methods, including physical arrest and force, to take someone into custody is decided by the involved

investigating officers based on the information they have available, including the behaviors of the

involved people. In the Florida Basic Recruit Academy curriculum, officers are taught:

> Law enforcement officers have been granted certain powers through statutes and
> case law. Many of these powers include an authorization to use physical force. It is
> the duty of the individual officer to determine the appropriate level of force based
> upon the facts and circumstances of each situation.[20]

The response by the Daytona Beach Police Officers was conducted in a manner consistent with

contemporary law enforcement methods inside and outside of the State of Florida. Officers receive initial

training regarding drug investigation techniques and arrests during their recruit academy training. The

curriculum is mandated by the Florida Criminal Justice Standards and Training Commission (CJSTC).[21]

Examined in research as applied specifically to the facts of this matter, is Kary Jarvis' noncompliance

with orders, resistance and obstruction by flight. These are predictors of increased risk as well as the

---

[19] https://www.hidtaprogram.org/central_florida.php
[20] Florida Law Enforcement Academy: Volume 1, Unit 2, Lesson 5 Use of Force
[21] Florida Law Enforcement Academy: Volume 1 Criminal Investigations

likelihood of use of force by officers and resistance during arrest.[22] Notable is that the behaviors attributed by the officers to Jarvis, that co-occur in many arrests that involve attempts to conceal evidence of crime are violent behavior, and non-compliance.[23]

The Daytona Beach Police Department provides in-service training.[24] The DBPD requires this training in an ongoing manner.[25] This in addition to the training academy block noted above.[26] The named Defendant officers were current in the training required by the State of Florida and their employer, the DBPD.[27] There were no articulated facts in the record of insufficient training in this matter, save the Complaint assertion that the named Defendant officers' use of force was excessive.[28]

With the complications that come with physical interaction, it can be easy for many people to believe a certain outcome was more predictable and thus that the trained responses of officers, to a threat were potentially incorrect rather than objectively reasonable. The appearance of cooperation or even isolated moments where resistance is not occurring does not reflect the moment-to-moment thoughts of the individual who eventually resists, flees or assaults citizens or law enforcement officers. After refusing to follow instruction,[29] Kary Jarvis got back into his vehicle and attempted to drive away with officers holding on, who were subsequently injured.  Such behavior, along with interfering with a lawful investigation, is addressed in the Florida State Statute "Resisting officer with violence to his or her person," contained within the Florida Crime Chapter on Obstructing Justice.[30] Officers are trained and understand that a person can act aggressively at any second.[31] The use of non-lethal force options is not

---

[22] Leinfelt, F. H. (2005). Predicting use of non-lethal force in a mid-size police department: A longitudinal analysis of the influence of subject and situational variables. The Police Journal, 78, 285–300.; Garner, J., Schade, T., Hepburn, H., and Buchanan, J. (1995). 'Measuring the Continuum of Force Used by and against the Police' *Criminal Justice Review* 20(2): 146–68.; Lee, J. (2016). Police use of nonlethal force in New York City: Situational and community factors. Policing and Society, 26(8), 875–888.

[23] McCarthy, Porter, L., Townsley, M., & Alpert, G. (2019). A Typology of Citizen Presentations in Police Use of Force Events: Are There Ecological Drivers? *Police Quarterly*, *22*(3), 360–387.

[24] DPPD Training Records of Defendant officers; deposition of Chief Young, p. 15

[25] Ibid.

[26] Criminal Justice Standards and Training Commission (CJSTC), Basic Recruit Academy Curriculum

[27] Training files of named Defendant deputies.

[28] Complaint

[29] DBPD Incident/Offense report

[30] FSS 843.01

[31] Florida Basic Recruit Training Program, High Liability, Volume 2

assigned specifically to one perceived or enacted behavior or potentiality. Rather, the category contains

trained techniques and tools that an officer may use if they are *reasonable*.[32]

The Commission for Florida Law Enforcement Accreditation, and other bodies that promulgate

standards, and comments upon police practices, do not and cannot dictate specific methods that local

agencies must employ to conduct lawful arrest operations. Guidance of the U.S. Constitution, state law,

case law, contemporary tactical training, and officer experience lead the way for a proper, and hopefully

effective, arrest. The assessment of arrest methods is framed by legal options and constraints, not a post

hoc opinion of what another person might have done differently.

Officers are trained in the mandatory Florida Law Enforcement academy curriculum. Specifically,

officers are trained In the Use of Force in Arrest and Detention component of the academy curriculum,

officers are taught:

> A law enforcement officer is justified in the use of any force when the officer reasonably believes
> it to be necessary to defend him- or herself or another person from bodily harm while making an
> arrest, when it is necessary for retaking felons who have escaped, and when it is necessary in
> arresting felons fleeing from justice.[33]

In this section, the language is quoted directly from the Florida Statute:

The statute states:

> A law enforcement officer, or any person whom the officer has summoned
> or directed to assist him or her, need not retreat or desist from efforts to
> make a lawful arrest because of resistance or threatened resistance to the
> arrest. The officer is justified in the use of any force:
> (1) Which he or she reasonably believes to be necessary to defend himself or
>     herself or another from bodily harm while making the arrest.[34]

---

[32] Hough, & Tatum, K. M. (2012). An examination of Florida policies on force continuums. *Policing: an International Journal
of Police Strategies & Management*, *35*(1), 39–54.
[33] Florida Law Enforcement Academy: Volume 1, Chapter 2 Legal
[34] Florida Basic Recruit Training High Liability, Volume 2, Use of Force

Based on the sworn testimony, official reports, and the totality of the circumstances, there is no relevant policy violation noted. Regardless of policy, there is no violation of established law or trained techniques as officers are trained.

The Court properly realized that the hindsight available after lengthy consideration of what *might* be done does not reflect the reality of an officer on the scene: "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."[35]  The Supreme Court has also commented on the unique perspective of the officer including language that "…when used by trained law enforcement officers objective facts meaningless to the untrained … [may permit] inferences and deductions that might well elude an untrained person."[36]

DBPD officers are expected to act within the routine and customary training of law enforcement officers, and within the force policy of the Daytona Beach Police Department.[37] The officers are entrusted by the citizens to arrest those who break the law. In Florida State Statutes,[38] Chapter 776.05 titled Law enforcement officers; use of force in making an arrest, provide the basis upon which DBPD officers were authorized to use force.

A law enforcement officer, or any person whom the officer has summoned or directed to assist him or her, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of any force:

(1)   Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest.[39]

---

[35] *Graham v. Connor*, 490 U.S. 386 (1989) at 396-397
[36] *United States v. Cortez*, 449 U.S. 411, at 418 (1980)
[37] DBPD Departmental Standards Directive 1006 Use of Force
[38] § 776.012(1), § 776.051, § 776.05 et seq., and/or § 776.07, in self-defense, in the protection of others or other police officers, to effectuate a lawful arrest
[39] FSS 776.051

Interacting with a subject with the hope of gaining compliance can be blocked by the behavior of the subject, as in the instant case of a man running with a gun at a group of citizens. What a human officer perceives at the moment leads to actions and reactions to the situation. Courts examine "…all facts and circumstances known to the officer at the time, or reasonably perceived by the officer as the basis for, a use of force decision."[40] This is referred to as *totality of circumstances,* and whether actions by officers are legally justified are based on this standard of objective reasonableness.  What a human officer perceives at the moment leads to actions and reactions to the perceived threat. Law enforcement officers do not have superhuman powers to discern what is going to happen at any call, let alone as they are drug away by a car driven by a fleeing suspect. As a result, officers are often put in potential and actual positions at risk of physical injury. A startling reality for many citizens *and* officers is that people will attack citizens and officers and harm them, and for reasons that seem unclear with the backward-looking distance of written reports and passing time.

The named Defendant officers attempted to use verbal direction practices taught to them as defensive tactics techniques from the training established by the Florida Criminal Justice Standards and Training Commission (CJSTC) and taught to all Florida officers to stop individuals or take arrestees into custody.[41] The greatest number and highest rate of officers assaulted is in the southeast United States.[42] For victim officers, the combined categories of responding to disturbance calls, and attempting other arrests, accounted for nearly 50% of all reported assaults during 2019.[43]

The U.S. Supreme Court in its decision in *Graham v. Connor* (1989) provided guidance in the critically important area of using force. In *Graham* the Court noted that, in part: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather

---

[40] Florida Basic Recruit Training Program, High Liability, Volume 2
[41] Florida Basic Recruit Training Program, High Liability, Volume 2.
[42] U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, Law Enforcement Officers Killed and Assaulted, 2019.
[43] U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, Law Enforcement Officers Killed and Assaulted, 2019.

than with the 20/20 vision of hindsight."[44] The danger signals of active non-compliance, and the further context of moving away from an officer, combine to inform an experienced law enforcement officer of the potential danger of a continuous and dynamic encounter of danger. The force options available to officers include the use of defensive tactics and various tools. The actions of the suspect and the totality of the circumstances in a given situation are examined after the fact, though they are based on officer perception at the moment force is applied.

The attempted warrant exception search of the Mitsubishi driven by Kary Jarvis was not an impermissible extension of the issuance of a warning citation, but the lawful use of a pretextual traffic stop in furtherance of a drug investigation.[45] Jarvis' extreme agitation and nervousness was an additional component of articulable factors in the officers' building their probable cause. Officers Tucker and Mackenzie were suspicious of Kary Jarvis as being involved in a drug activity prior to initiation of a stop ostensibly for failure to come to a complete stop. Investigating drug crimes involving vehicles, and that have as a component an investigative traffic stop,[46] are ongoing events that unfold in ways that cause officers to shift their focus – including to a violent reaction from a suspect. The fact that the officers did not immediately remove Jarvis from the vehicle and search the area where Officer Tucker saw Jarvis moving his hands around may amount to a chronological or sequential misstep, not a change in the intention of the investigative effort. A pretext stop makes self-evident that the end goal of the stop was not to issue a warning citation for not completely stopping when entering a roadway from a parking lot.

Indeed, asking someone for permission to search somewhere, such as a vehicle, is a well-established practice that provide an investigative indication by gauging the person's reaction,[47] regardless of whether independent probable cause may already be established. The questions posed by Officer

---

[44] *Graham v. Connor*, 490 U. S. 386, 396-397.

[45] *Whren*, 517 U.S. 806.

[46] Epp, D. A., & Erhardt, M. (2021). The use and effectiveness of investigative police stops. *Politics, Groups & Identities*, *9*(5), 1016–1029.

[47] Antaki, C., & Stokoe, E. (2017). When police treat straightforward answers as uncooperative. *Journal of Pragmatics*, *117*, 1–15.

Tucker allow a trained and experienced officer to probe and observe for criminal activity that may not be apparent as a vehicle moves down a street. There was no attempt at trickery by the named Defendant Officers. The officers maintained a patient professionally average demeanor. Kary Jarvis was not in a novel situation, and he was aware of the consequences of being caught with the heroin or fentanyl in his constructive possession. Having spent a significant portion of his adult life in prison for various felony crime convictions, he was motivated not to return there. The opening of the traffic stop stage of this drug investigation is when Officer Tucker informed Mr. Jarvis of the initial reason for the stop, i.e., failing to fully stop exiting a parking lot. This invites cooperative conversation before moving to the next step.[48] Initially, Mr. Jarvis aligned his behavior with what he believes or hopes the business of the stop is about. Officer Tucker asks various questions (e.g., Where are you coming from? Is this your correct address?) and makes requests (e.g., May I see your license and registration?).

While Plaintiff's expert spends some time discussing parameters of voluntary consent searches, this misses the point that the eventual stated search by the officers was not going to be based on consent, but rather articulable probable cause that they may have failed, as many officers do, to coherently articulate. In other words, the basis would not have solely been furtive movements, though it might have been. The building blocks included the initial call of a possible narcotics violation with comments, the observed furtive movement when the stop was initiated, the traffic stop, and the driver's behavior.

As Officer Tucker just reached the rear of Mr. Jarvis' Mitsubishi on his initial approach to the driver's window, Jarvis was already asking out of the window over his shoulder "what did I do wrong?"[49] Officer Mackenzie remained at Mr. Jarvis' car while Officer Tucker returned to his squad car.[50] When Officer Tucker re-approached Mr. Jarvis, presented the Warning Citation, and asked if the officer might search the vehicle, Mr. Jarvis refused and added "Just harassing me for nothing." After Officer Mackenzie

---

[48] e.g., Schegloff, E.A., 1968. Sequencing in conversational openings. Am. Anthropol. 70 (6), 1075e1095.;
Schegloff, E.A., 1986. The routine as achievement. Human Stud. 9 (2-3), 111e151.
[49] Tucker AXON video X81269273 2020-10-23
[50] BWV and deposition of Officer Mackenzie, p. 7

explained to Mr. Jarvis that the "furtive movements" observed by Officer Tucker allowed the officers to search in just those areas where the movements "into certain areas" were "and only those areas."[51] In response to being told the officers would search just those areas (where drugs were later located in the air vents on either side of the steering wheel), Kary Jarvis stepped out of the car and turned in a circle pulling his shirt, saying "I'll let you see" and twice saying "I ain't got no drugs on me," "You can search my pockets." When Officer Tucker asked Mr. Jarvis to stand in a particular area, as officers are trained for safety, Mr. Jarvis objected, stepped back forward to the driver's door, and said "I'm going to watch him though, 'cause I didn't do nothin' wrong." Mr. Jarvis' stance remains "I didn't do anything wrong," coupled with an inexorable momentum toward eventually fleeing the fraught encounter with Officer Tucker and Officer Mackenzie.

As Officer Tucker continued to explain that Jarvis could not stand by where Mackenzie is searching, Jarvis moves to the car door, still stating he did not do anything wrong, and "this is bullshit, man." Jarvis then places his right hand on top of the open driver's door. As Mr. Jarvis continues to argue, he turns his body toward the car interior, looking down into the car. As Officer Tucker tells Jarvis that if there's nothing there he can go on his way, Jarvis sits back down into the car. As both officers grasp Jarvis' left arm, Jarvis repeats "don't do me like that, man." During this exchange, Kary Jarvis says "I want to talk to somebody." He then calls to passersby and motions them saying "hey ya'll see this man", "ya'll see this bullshit." Each of the officers now had a grasp of Mr. Jarvis' left arm. It is clear he is no longer free to go. In the next moment Kary Jarvis transitions to the use of violence in resisting what he will later through counsel assert is an unlawful arrest. Florida law, as in every state, prohibits the use of force to resist even what may eventually be deemed an unlawful arrest.[52] One of the officers warns Jarvis

---

[51] Ibid. Officer Mackenzie speaking
[52] 776.051 F.S. **Use or threatened use of force in resisting arrest or making an arrest or in the execution of a legal duty; prohibition.**—
(1)    A person is not justified in the use or threatened use of force to resist an arrest by a law enforcement officer, or to resist a law enforcement officer who is engaged in the execution of a legal duty, if the law enforcement officer was acting in good faith and he or she is known, or reasonably appears, to be a law enforcement officer.;  3rd degree felony

"don't do it," Jarvis says "fuck ya'll," and further takes knowing actions turning on his car, putting it in drive, and with no regard for the lives or safety of Officers Tucker and Mackenzie, accelerates away with both officers trying to hold on.

The arguable aspects of the totality of the circumstances leave open the clear conclusion that reasonably trained and supervised officers with the same set of facts may well have proceeded in the same manner. At least one knife was observed by Officer Mackenzie in the console of the Mitsubishi. Several more including a switchblade and spring-loaded knife were later discovered. The concern for weapons was not, and is never, misplaced. There is nothing "noteworthy" [as stated by Mr. Tiderington] that Officer Mackenzie made statements during the traffic stop portion of this investigation about Officer Tucker's observation of the furtive movements. Cumulative knowledge by officers within a single event is neither impermissible nor unusual as officers work in concert with the goal of gaining information and moving an investigation along. Officers in Florida are taught in the Basic Recruit Academy:

Under the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. *United States v. Meade*, 110 F.3d 190, 193-94 (1st Cir. 1997)

Mr. Tiderington opined that the Daytona Beach Police Department "has consistently demonstrated a custom and practice of inadequately supervising, training, and disciplining its personnel…"[53], though he offers no facts in support of a custom or a practice. Mr. Tiderington refers instead to the initiation of a Professional Standards investigation at the point of a citizen complaint rather than at the point of the initial event when Kary Jarvis was arrested. At that point, October 23, 2020, there was no complaint, and no indication that some incorrect procedures may have been employed or, as I have indicated, a possible need to debrief regarding articulation of reasonable suspicion, probable cause, and steps to more effectively complete various investigations.

---

[53] Plaintiff Report by Mr. Tiderington

While the ongoing investigation into possible drug activity animated the officers' actions, Mr. Tiderington in this same analysis offers a straw man argument and states that "…they failed to particularize and detail any objectively reasonable basis for suspecting that Jarvis *was armed or had access to a weapon (my emphasis)*."[54] In fact, Officer Mackenzie is heard on BWV pointing out one of the knives in Mr. Jarvis' possession in the console of his vehicle. While Mr. Tiderington goes on to say in his second opinion: "As further evidence of this pattern and practice I reviewed and considered **a** [*one*] (*my emphasis*) very similar case…"[55] In offering one case, from 5.5 years earlier, Mr. Tiderington does not offer "further evidence" of a "pattern and practice." He offers one case with different facts, and search based on consent. In an uncompelling final statement, Mr. Tiderington concludes "Moreover, the evaluation and internal investigation of this matter were unreasonable and did not align with widely recognized police practices and standards." Nothing is offered as to why Mr. Tiderington believes the internal investigation was unreasonable and "did not align with widely recognized police practices and standards," which he did not specify. This is unsupported.

Officers are taught in the Florida Basic Recruit Academy in regard to pretext stops:

### Pretext Stops

Sometimes, an officer may suspect that evidence of criminal activity is in a vehicle, but the officer won't have enough information for reasonable suspicion to make a stop. However, if the driver of the vehicle commits a traffic infraction, or if the vehicle shows evidence of an equipment violation, such as a broken headlamp, the officer may stop the vehicle on that basis. Such stops are sometimes called ***pretext stops***, because the officer stops the vehicle due to an equipment violation but really wants to investigate other, more serious criminal activity. Pretext stops were formerly considered a violation of the Fourth Amendment. However, the U.S. Supreme Court, in *Whren v. U.S.*, 517 U.S. 806 (1996), said that the courts are not required to consider an officer's motive for stopping a vehicle as long as the officer had an objective basis for the stop. Because of *Whren*, pretext stops do not violate the Fourth Amendment. Thus, a detective who suspects that a vehicle contains drugs can stop the driver for failing to signal for a turn. This stop is valid even if the detective is not assigned to traffic patrol and does not normally stop drivers who fail to signal for turns.

---

[54] Report by Mr. Tiderington P. 23
[55] Report by Mr. Tiderington P. 24

Further, as to Probable Cause:

**Probable Cause**

The standard of justification required to make an arrest or conduct a search is probable cause. Because probable cause justifies greater invasions into a person's privacy, it is a stricter standard than reasonable suspicion. ***Probable cause*** is a fair probability or reasonable grounds to believe that someone committed a crime, based on the totality of circumstances. The U.S. Supreme Court gives the following information about probable cause:

Probable cause exists where facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed . . . we deal with probabilities. They are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *Draper v. U.S.*, 358 U.S. 307 (1959)

… In deciding whether the reasonable suspicion or probable cause standards have been met, courts review all factors known to the officer at the time of the incident. This is known as the ***totality of circumstances*** test.

… To establish probable cause and subsequently make an arrest or conduct a search, an officer may rely on many types of information and evidence. The officer's training and experience are important factors in helping develop probable cause. The officer's use of information and evidence is not limited by the rules of evidence used in criminal trials. For example, a prosecutor cannot relate hearsay statements and anonymous tips to a jury for the purpose of determining guilt. However, an officer can use this information to justify probable cause or reasonable suspicion.[56]

According to the reports and testimony in this matter, Kary Jarvis made it clear to any objectively reasonable officer that he was nervous, and non-compliant through his actions, creating in a reasonable officer a well-founded belief that he may be trying to misdirect the officers' attention from searching for

---

[56] Florida Criminal Justice Standards and Training Commission, Basic Recruit Academy Manual

drugs. The use of force to attempt to halt a person perceived to be a risk of serious injury or death to others is a lawful, trained, and objectively reasonable option.

The International Association of Chiefs of Police, in its publication "Motor Vehicle Stops,"[57] instructs agencies and officers in part:

The "stop and frisk" rule of *Terry* v. *Ohio*,⁹ also applies to motor vehicles. Therefore, if an officer observes, or receives from reliable sources, information that creates reasonable suspicion or probable cause to believe that the vehicle or its occupants are involved in a crime, the vehicle may be stopped.  (See *United States* v. *Sharpe*, 470 U.S. 675 (1985); *United States* v. *Cortez*, 449 U.S. 411 (1981).)

Reasonable suspicion to sustain a vehicle stop is established in each incident by an assessment of the totality of the circumstances. Such an analysis must provide an officer with a particularized and objective basis for suspecting legal wrongdoing. As the U.S. Supreme Court has noted, "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might elude an untrained person.'" *United States* v. *Arvizu*, 534 U.S. 266, 273 (2002), citing *Cortez*, 449 U. S., at 418.)

The policies of an agency and administrator oversight are important to how employees function. If the Daytona Beach Police Department did not have policies and procedures, did not utilize a chain of command, failed to require written documentation of enforcement activities carried out by employees and maintain such paperwork, CAD notations, etc., for review, they would not be in step with other similarly situated agencies across the United States. This is not the case. The Daytona Beach Police Department has such policies and procedures in place to address human resources, management, and law enforcement functions.[58] The agency policies include "Disciplinary Procedures." This procedure notes, in part,

1206.1 Discipline should be characterized as corrective and constructive rather than punitive, and disciplinary actions should be utilized to motivate employees to develop good work habits and attitudes contributing to the successful operation of the Department.[59]

**Conclusions and Opinions**

Through my experience as a law enforcement officer, trainer, and administrator, law enforcement academy director, field training officer/supervisor/commander, more than thirty-five years of teaching law

---

[57] Departmental Standards Directive 1206
 IACP LAW ENFORCEMENT POLICY CENTER, Motor Vehicle Stops, Concepts and Issues Paper, Updated: May 2018
[58] Daytona Beach Police Departmental Standards Directives
[59] Daytona Beach Police Departmental Standards Directive 1206.1 Disciplinary Procedures

enforcement procedures to academy recruits, in-service officers, and college and university students, my

personal experience of conducting and supervising the conduct of law enforcement business, my ongoing

research and analysis of such practices, my academic and professional presentations, my authorship of

various documents, and based upon a reasonable degree of professional certainty it is my opinion that:

1.  Daytona Beach, Florida has a crime rate significantly higher than average both in Florida,
    and in the United States. Violent crime has increased, as well as population.

2.  The drug investigation methods in this case conducted by the Named Defendant officers,
    were objectively reasonable under the totality of the circumstances and followed normal
    practice and training in such cases.

3.  The tactics by the Named Defendant officers in this case were objectively reasonable under
    the totality of the circumstances and appropriate and in accordance with training that
    officers receive in Constitutional guidance, state law, case law, DBPD policy, recruit
    academy training, and law enforcement practices. In this incident, there was no evidence
    that force was used by officers in any way other than as authorized. This rebuts an opinion
    that the agency fails to supervise, train, and discipline members.

4.  Based on the reports, sworn testimony, and the totality of the circumstances, and regardless
    of policy, there is no violation of established law, training, or customary practice as
    officers in Florida are trained. I have reviewed a number of the DBPD Departmental
    Standards Directives implicated in this matter. These policies of the Daytona Beach Police
    Department comport with contemporary policies of law enforcement agencies in Florida
    and across the U.S. Further, evidence of the use of these policies as the foundation of
    practice is established through the routine writing of police incident reports, which are
    reviewed during field training of new officers, daily by supervisors for in-service officers,
    and subsequently filed within the records section of the agency where the reports are

available to public and private entities, the courts, and citizens under Florida law. A

violation of a department policy is not a Constitutional violation.

5.    The Daytona Beach Police Department provides Field Training Officer training and in-

service training regarding topics to supplement and extend beyond that which Florida

certified law enforcement officers already receive during their Academy training. This

rebuts an opinion that the agency fails to supervise and train members.

6.    The official reports of DBPD officers in this matter are consistent and agree on the facts

and do not contradict physical evidence in the case.

7.    Physiological arousal, and physical performance impacts are the norm in high-stress and

arrest events. No unexpected or unusual response or actions by officers were noted.

8.    I reviewed no information indicating either a pattern or a practice of intentional behavior or

official misconduct by officers at the Daytona Beach Police Department. Reference by

Plaintiff's expert to a case from several years prior to the instant matter, and with no

articulated facts about investigating a citizen complaint of drug transactions,[60] is not

persuasive. This rebuts an opinion that the agency of a pattern and practice.

9.    The Office of Professional Standards began an investigation timely upon receipt of Mr.

Jarvis' complaint. The investigation was conducted in an industry-normal manner. This

rebuts an opinion that the agency fails to supervise, train, and discipline members, as well

as the unsupported statement that "Moreover, the evaluation and internal investigation of

this matter were unreasonable and did not align with widely recognized police practices

and standards."[61] In addition, the Office of Professional Standards issues an annual report

available to the public.

---

[60] Report by Mr. Tiderington, p. 24
[61] Ibid., p. 26

10. Reference to cases without substantive analysis of case facts to provide a basis of meaningful comparison is insufficient to assert that a "well-settled practice and custom to permit law enforcement officers…to fabricate evidence and make false arrests in violation of citizens' Constitutional rights…" is represented. Rather, separate and specific analysis of each listed matter, and a time-series comparison to like agencies would be minimally necessary to try to establish any deviation from a possible norm. Further, there is no analysis offered as to how such alleged practices were in any way connected to the instant matter. This rebuts an opinion that the agency fails to supervise and train members.

11. The DBPD Deputies appropriately summoned EMS and helped transition to a joint law enforcement-EMS effort. This is the routine and customary practice and training for first responders.

12. The agency tracks arrest incidents and reviews them through a standard hierarchical submission through the chain of command. This is the industry standard. This rebuts an opinion that the agency fails to supervise and train members.

13. The Daytona Beach Police Department uses acceptable patrol management methods. Law enforcement investigations and interactions are constrained by statute, case law, policy, training, supervision by higher authority, report review, and the proper conduct of the officers who wield the authority to conduct them. DBPD officers assigned to law enforcement duties have received training in appropriate patrol, investigations, and use of force options. This rebuts an opinion that the agency fails to supervise and train members.

14. I have reviewed the training files of the Named Defendant officers. Each was trained and current in his agency and State certification requirements. This rebuts an opinion that the agency fails to supervise and train members.

15. The Named Defendant Officers were trained in the policies of the Daytona Beach Police Department and completed required academy and in-service training related to their

position and duties. This rebuts an opinion that the agency fails to supervise and train members.

16.    I reviewed no evidence that Daytona Beach Police Department Officer Tucker and Officer Makenzie disregarded standard practices in the incident under review. This includes compliance with accreditation requirements that an agency have policies and procedures addressing patrol operations functions.

17.    The Named Defendant officers were trained in the use of force. This training was accomplished both through the law enforcement academy experience and Florida state-mandated curriculum, the Daytona Beach Police Department Field Training Officer program, various employment seminars, and online training blocks. The Daytona Beach Police Department provided in-service training for officers assigned to law enforcement positions. This is expected, customary, CJSTC required, and accreditation compliant. This rebuts an opinion that the agency fails to supervise and train members. It is not clear that either officer actually attempted to use or did use force in this incident.

18.    Supervisory personnel of the Daytona Beach Police Department routinely review the actions taken by officers during arrest, including those with alleged or actual injury involved. This rebuts an opinion that the agency fails to supervise, train, and discipline members.

19.    The DBPD Response to Resistance/Blue Team Report is not required in all arrest incidents. As Mr. Jarvis got into his car against the officer's instruction and showed an intention to drive away, the officers reached for his arm to stop him. Such physical attempts to grab Mr. Jarvis' arm may possibly be viewed as an attempted takedown. Such an officer action would not require a Response to Resistance Report, had anybody on scene viewed it that way. The Incident Report and Charging Affidavit contained all information required by the agency to review the arrest and officer actions.

20.    The Daytona Beach Police Department policies provide the necessary and expected broad
guidance to members for carrying out law enforcement functions and duties. Officers are
directed to conduct their activities with respect for the constitutional rights of citizens.
These policies are standard within law enforcement. This rebuts an opinion that the agency
fails to supervise and train members.

21.    The law enforcement tactics in this case were reasonable and followed standard training in
cases involving efforts to investigate drug crime. There was no noted deficiency in the
reviewed policies and practices of the Daytona Beach Police Department that would make
it apparent that officers would not know how to complete an arrest.

22.    Activities of all personnel, including officers, are supported and monitored by supervisors
and subject to internal and external agency review. The Daytona Beach Police Department
utilizes a criminal justice industry-standard personnel early intervention program (EIP). All
such voluntary early identification systems, where they are in place, endeavor to support
effective and appropriate employees' completion of duties. Such programs raise awareness
to monitor for performance trends that may require some type of intervention, to include
guidance, correction, training for employees who negatively deviate from expectations and
standards. Such programs may also be the conduit for disciplinary measures when
appropriate. This rebuts an opinion that the agency fails to supervise, train, and discipline
members.

23.    The Daytona Beach Police Department policies and procedures outline the documentation
requirements for citizen interactions and arrests. The procedures are standard within
contemporary law enforcement. This rebuts an opinion that the agency fails to supervise
members.

24.    The Daytona Beach Police Department is an accredited agency by the Commission on
Florida Accreditation for Law Enforcement Agencies, Inc. The independent reviews certify

that a law enforcement organization meets prescribed standards in the field. Key in the

lengthy process to pursue accreditation is the development and maintenance of the policies

and procedures that guide agency members. The Daytona Beach Police Department has

been reaccredited multiple times for its ongoing commitment to excellence demonstrated

through its operations, documentation of efforts, and review by external independent

authority.

25.    To the extent that either Named Defendant officer had a hand on the wheel of Mr. Jarvis'

vehicle, any movement to either direct the car or merely hold on, is not a use of force, and

is moot and objectively reasonable under the totality of the circumstances.

Respectfully submitted,

*Richard M. Hough, Sr.*

Dr. Richard M. Hough, Sr., CPP, CCHP, SHRM-SCP

Appendix A – Furnished Documents Reviewed

Other sources cited in-text

| | |
|---|---|
| 1. | Complaint; |
| 2. | Marville Tucker's Answer and Affirmative Defenses to Plaintiff's Complaint; |
| 3. | James Mackenzie's Answer and Affirmative Defenses to Plaintiff's Complaint; |
| 4. | City of Daytona Beach's Answer and Affirmative Defenses to Plaintiff's Complaint; |
| 5. | 707 Charging Affidavit, Agency Case No. 200018358; |
| 6. | Incident Report, Agency Case No. 200018358; |
| 7. | Narrative Supplement prepared by James Mackenzie, Agency Case No. 200018358; |
| 8. | Narrative Supplement prepared by Toure Randolph, Agency Case No. 200018358 |
| 9. | Narrative Supplement prepared by Toure Randolph, Agency Case No. 200018358 |
| 10. | Narrative Supplement prepared by Marville Tucker, Agency Case No. 200018358 |
| 11. | Property and Evidence Receipt signed by Kary Jarvis |
| 12. | CAD history for Police Event No. P202971961 |
| 13. | CAD history for Police Event No. P202980295 |
| 14. | Departmental Directives<br><br>• Arrest Procedures #600<br><br>• Community Oriented Policing Philosophy #106<br><br>• Disciplinary Procedures #1206<br><br>• Oath and Cannon of Ethics #204<br><br>• Mobile Video Recorder #904<br><br>• Personnel Complaints #1230<br><br>• Training Administration & Coordination #1110<br><br>• Use of Force #1006 |
| 15. | Discovery<br>• Plaintiff's Answers to Interrogatories<br>• City of Daytona Beach's Answers to Plaintiff's Interrogatories<br>• Marville Tucker's Amended Answers to Plaintiff's Interrogatories<br>• James Mackenzie's Answers to Plaintiff's Interrogatories<br>• Plaintiff's Request for Admissions to City<br>• City of Daytona Beach's Responses to Plaintiff's Request for Admissions<br>• Deposition transcript of Joseph Cerce<br>• Deposition transcript of Abisai Roman<br>• Deposition transcript of James Mackenzie |
| 16. | Axon<br>All body camera video captured in connection with the subject incident |
| 17. | Training<br>• List of Training completed by James Mackenzie<br>• Lists of Training completed by Marville Tucker |
| 16. | Plaintiff's Expert Witness Report and attachments |
| 17. | IA Investigation 2022-004 Mackenzie |
| 18. | Marville Tucker Criminal Deposition Transcript |
| 19. | James Mackenzie Criminal Deposition Transcript |

| 20. | Plaintiff's Motion for Summary Judgment (against defendant officers) |
|-----|---------------------------------------------------------------------|
| 21. | Kary Jarvis deposition |

21. Kary Jarvis deposition
- o Exhibit A – FDOC Inmate Population Information Detail regarding Kary Jarvis
- o Exhibit B – Jail Call
- o Exhibit C – CAD
- o Exhibit D- Jail Call
- o Exhibit F – Jail Call
- o Exhibit G – Volusia County Jail record
- o Exhibit H – Plaintiff's Answers to Interrogatories
- o Exhibit I – Evidence sheet
- o Exhibit J – Jail Call

Appendix B

## FEES AND EXPENSE POLICY/Initial Invoice

**Initial Consultation**

An initial discussion or written correspondence with counsel is beneficial to understand the nature and scope of the case. This allows me to determine whether to serve as a witness or consultant in the case. These fees and conditions are to be communicated by retaining counsel to opposing counsel as needed and to ensure payment arrangements.

**Retention**

A retainer of $3,000.00 is required in advance for case review and opinion, preparation, and to secure services and hold dates. This initial, non-refundable fee to be applied against the first 15 hours of work performed under this agreement. The fee should be included with the initial materials for review. If after initial consultation and review you decide to disclose me as an expert witness, an additional non-refundable fee of $2,000.00 must be received by me prior to being named as an expert in the case. For grand jury and state-court cases that may not require report generation, the entire fee is due at time of retention. The combined total is $5,000.00.

It is understood that my services are as a consultant; that payment for same shall be made promptly and is not contingent upon the results of any legal action, arbitration or settlement; and, that costs incurred, or the time spent at the demand of other parties to any litigation (including depositions and expenses) will be billed to the party making the demand; but responsibility for payment is that of the client. Retainers to review files for multiple clients will be formulated to reflect the complexities of analysis of several individuals or entities in a matter.

**Direct Time**

Billed at $350.00 per hour, this includes investigations, conference, research, analysis, and reporting (both written and oral). Travel time $150 per hour. Travel fees for depositions, site visits, or court are contingent on the location of services needed and include per diem of $600.00 per day to defray lodging, meals, and ground transportation. These expenses and round-trip travel expenses, including time in transit, must be received at my office five business days prior to a scheduled deposition, site visit, or trial. Additional fees that exceed the $5,000.00 in retainers up to the point of being disclosed as expert will be billed as accrued. In such instances, an estimate of additional hours will be provided to counsel in advance of the additional work if requested.

**Depositions**

Opposing counsel is charged a flat fee of $1,800.00 if my live, telephone, or video deposition of up to four hours is taken within 15 miles of my location, payable five business days in advance. Additional hours are billed at $500 per hour or portion of an hour. Depositions at any other location requested by opposing counsel is $2,500 plus travel and per diem expenses for all or any portion of a day. It is the responsibility of requesting counsel to arrange for court reporters and location for depositions. It is the responsibility of retaining counsel to communicate this cost to requesting counsel. All fees associated with depositions must be received at my office at least five business days prior to travel or deposition.

**Trial Time**

My trial appearance fee is $4,000.00 per day, plus travel and per diem expenses. Invoiced amount must be received five business days prior to my scheduled or anticipated testimony. If delay results in my not testifying on the scheduled date, an additional $3,000.00 fee will apply for each day or portion of a day. If, in the five business days prior to trial, I am cancelled by counsel, per diem expenses will be refunded and 50% of the trial fee. Other travel costs may be partially refunded.

Upon receipt of your authorization and initial retainer (this agreement serves as initial invoice), I will proceed in your behalf.

Sincerely, *Dr. Richard M. Hough, Sr., Consultant*    Style of case: _____

Authorized by: _____    Date: _____

Appendix C – cv

**Dr. Richard M. Hough, Sr., CPP, CCHP, SHRM-SCP**
East Tennessee State University
Department of Criminal Justice and Criminology

ORCID: https://orcid.org/0000-0002-5106-5694

**EDUCATION**

> **University of West Florida**
> Doctor of Education; Public Administration concentration
>
> Dissertation Title: The Influence of Race, Gender, and Perceived Barriers of Law Enforcement Officers on Self-Efficacy of Career Decisions
>
> **Harvard University, John F. Kennedy School of Government**
> Master in Public Administration
>
> **Saint Leo University**
> Bachelor of Arts in Public Administration, *cum laude*
>
> **University of South Florida**
> Master of Public Administration (ABT)

**ACADEMIC EXPERIENCE**

**ACADEMIC APPOINTMENTS**

> **2022 – East Tennessee State University, Professor of Practice**
> Department of Criminal Justice and Criminology
>
> Courses taught: Homicide, Juvenile Justice, Corrections, Criminal Justice Management, Criminal Investigations, The Use of Force in Criminal Justice, Medico-Legal Investigation of Death, Advanced Forensic Investigation
>
> **2006-2021, University of West Florida, Instructor**
> Joint Appointment in Department of Criminology and Criminal Justice and Department of Administration and Law
>
>> **2006-2021, Department of Criminology and Criminal Justice**
>> **2006-2007, Coordinator of UWF Emerald Coast Campus**
>
> Courses taught: Police Use of Force and Intersectionality, The Use of Force in Criminal Justice, Police in a Free Society (now Policing), Criminal Justice Management & Organization, Punishment & Society (now Corrections), Criminal Investigations, Homicide, Cold Case

Investigations, Gangology, Serial Killers, Sex Crimes Investigation, Violence, Juvenile Justice, Punishment & Society (now Corrections), Race-Gender-Ethnicity & Crime, Survey of Crime and Justice Private Security, Criminology, Historical Crime, Crime and Public Policy (Graduate), Terrorism and Homeland Security (Graduate), Criminal Justice Administration (Graduate). Other courses listed below.


**2016-2021, Department of Administration and Law**
**2016-2018- MSA Coordinator, Department of Administration and Law**

Courses taught: Public Policy, Public Administration, Analytic Techniques of Public Policy (Graduate), Human Resources Management for Public Organizations (Graduate), Leadership (Graduate), Capstone (Graduate)

**2005-2006, University of South Alabama, Visiting Instructor**
Department of Political Science and Criminal Justice

Courses taught: Policies and Procedures of Corrections, Police Operations, Contemporary Policing, Race-Gender-Ethnicity & Crime, Introduction to the Offender (Criminology), Homicide, Diversity in Public Administration (UG, Graduate).

**2003-2004, University of West Florida, Instructor**
Department of Criminal Justice and Legal Studies


# HONORARY ACADEMIC APPOINTMENTS

NOTE: I was in the U.K. Fall semester 2019 on a sabbatical conducting comparative research and lecturing on police use of force and investigative practices in the U.S. and U.K.

**Academic Visitor, Cardiff University, Cardiff, Wales, Fall 2019**

**Visiting Instructor, University of Brighton, U.K., Fall 2019**

**Visiting Fellow, Edge Hill University, U.K., Fall 2019**

# ADJUNCT ACADEMIC APPOINTMENTS

**Professor, 2016- present; Associate Professor, 2007-2016**
**University of Maryland, Global Campus**
Department of Criminal Justice and Investigative Forensics

Courses taught: CJ Management (Graduate), Criminal Justice Administration, Introduction to Criminal Justice, Private Security/Introduction to Security Management (Undergraduate), Medico-Legal Investigation of Death, Criminalistics, Corrections

**Instructor, Criminal Justice Academy, 1995-2021**
George Stone Technical College, Pensacola, FL

Subjects taught**:** Patrol Procedures, Community-Oriented Policing, Human & Cultural Diversity, Ethics, Officer Survival, Investigations, Homicide and Robbery Investigations, Gangs-Extremist Groups, Defensive Tactics – Use of Force, Substance Abuse and Use by Inmates, Juvenile Inmates, Special Inmate Populations, Handling Mental Health-challenged Individuals, Baker Act. Served as member of the Regional Criminal Justice Advisory Committee 2014-current.

**1999 - 2003, Instructor of Criminology and Criminal Justice**
University of West Florida, Pensacola, Florida

Courses taught: Police in a Free Society, Criminal Investigations, Punishment in Society, Police Administration.

**1996-2003, Instructor of Public Administration**, **MPA Program**
University of West Florida, Pensacola, Florida

Courses taught:  The Public Administration Professional, Governmental Innovation and Re-engineering, Policy Analysis, Leadership.

**1996-2016, Faculty**
Troy University

Courses taught: Homicide, Criminal Justice Administration, Introduction to Corrections, Correctional Rehabilitation and Counseling, Correctional Management, Public Administration.

**2008-2018, Faculty**
Colorado Technical University Online

Courses taught: Police Operations, American Diversity, Forensic Criminology, Corrections, Juvenile Justice, Juvenile Delinquency, Homeland Security and Terrorism (Undergraduate), Homeland Security Strategy, Critical Infrastructure and Homeland Security, Homeland Security and Terrorism (Graduate), Criminology and Public Policy (G), Corrections Management (G), Criminal Justice Capstone (G), Special Topics in Criminal Justice (G).

**2000, Instructor**
Okaloosa-Walton Community College (now Northwest Florida State College), Public Safety Division

Course taught:  Law Enforcement Ethics.

**1991 – 1995, Faculty**
Saint Leo University

Courses taught: Public Administration, Introduction to Corrections, Law Enforcement Administration.

**1989 – 1995, Adjunct Faculty**
Manatee Community College (now Manatee-Sarasota State College)

Courses taught: Criminal Investigation, Public Administration, Juvenile Justice, Introduction to Corrections, Policing. Served as Chairman Criminal Justice Advisory Committee 1993-95.

**1984 – 1995, Instructor**
Manatee Area Vocational-Technical Center, Criminal Justice Academy

Subjects taught: Patrol Procedures, Defensive Tactics – Use of Force, Human & Cultural Diversity, Interpersonal Communications, Ethics, Interviews & Interrogation, Instructor Techniques, Report Writing, Advanced Correctional Techniques for Officers, Correctional Emergency Response Team (CERT), Train the Trainer for Detectives, Instructor Techniques, others.

## PROFESSIONAL EXPERIENCE

**1998-2003 Florida Department of Juvenile Justice, Detention Services**

### Senior Management Analyst (former Chief of Support Services) (2002-2003)
Working group to develop Detention Emergency Response Teams in Juvenile Justice to address significant incidents. Use of Force, policy, and tactical procedures SME.

**Detention Superintendent**, Escambia Regional Juvenile Detention Center (6 months concurrent while assisting in the hiring of a new superintendent) Florida Department of Juvenile Justice

**Detention Superintendent**, Okaloosa Regional Juvenile Detention Center (**1998-2002**) Florida Department of Juvenile Justice

Hired and oversaw the development and training of 70+ officers and staff for first of five prototype detention facilities in Florida.

Coordinated first-ever state detention officer academy conducted remote from the state capital.

Responsible for home-based community corrections component of Detention.

Created a Juvenile Detention Training Officer (DTO) program adopted statewide. Training SME for juvenile detention officers.

Served as subject matter expert for state-wide group developing tactical emergency response in facilities

Trained Quality Assurance assessor for State of Florida, Detention Centers

**1995-1998 Santa Rosa County, Florida Sheriff's Office**

### Enforcement Bureau Administrator (1996 – 1998)
- Leadership through three divisions of all facets of agency law enforcement operations.
- Lead initial efforts in pursuit of state accreditation.
- Revamped Field Training Officer (FTO) Program.
- Instituted agency-wide use of force training
- Instituted agency officer fitness program
- Served as Chief Defensive Tactics-Use of Force Instructor

### Corrections Bureau Administrator (1995 - 1996), CERT Commander
- Leadership through three divisions of all facets of agency adult and juvenile corrections operations.

- Conceptual design of new sheriff's office and jail facility on all interior spaces, and functional flow. Overall project manager.
- Planner and manager of transitioning inmates to new facility.
- Created and trained Detention Training Officer program.
- Developed, trained, and led tactical unit (CERT).

**1981–1995 Manatee County, Florida Sheriff's Office**

**Deputy Chief, Corrections Bureau (1991 – 1995), CERT Commander**

Training Administrator for Sheriff's Office

Served as Chief Defensive Tactics-Use of Force Instructor

Leadership through three divisions of all facets of agency adult and juvenile corrections operations. 280 employees and 1,000 inmates.

Created and trained Detention Training Officer program.

Lead the efforts to obtain national accreditation (ACA) for Corrections Bureau.

Team member of law enforcement accreditation responsible for patrol, investigations, and narcotics divisions (CALEA)

Conceptual design of new jail facility. Overall project manager.

Project manager and trainer for first juvenile boot camp in Florida

Planner and manager of transitioning inmates to new facility.

Developed, trained, and led tactical unit (CERT).

*1990 – 1991  Leave of Absence while attending graduate school at Harvard University*
**Law Enforcement and Corrections Academy Coordinator (1991)**
**Administrative Division Commander (1989 – 1990)**
**Policy Advisor to the Sheriff (1988 – 1989)**
**Assistant to Patrol Commander (1987 – 1988)**
**Field Training Commander (1987)**
**Patrol Sergeant, Field Training Supervisor (1985 – 1986)**
**Homicide Detective (1983 – 1985)**
**Sheriff's Deputy / Field Training Officer (1981 – 1983)**

**1980–1981 Longboat Key Police Department, Longboat Key, FL**
**Department Training Officer / Senior Patrol Officer**
**1979 Bradenton Beach Police Department, Bradenton Beach, FL**
**Patrol Officer, Motor Officer**

**CRIMINAL JUSTICE CONSULTANT EXPERIENCE**

Retained in more than seventy state and federal cases since 1991.

Areas of focus include:

Criminal justice policy

Use of Force

Police practices

Investigative practices

Forensic Criminology

Suicidology; Psychological Autopsy Investigation

Jail and corrections practices

Juvenile justice and detention practices

Human Resources

Internal Affairs

Bias-Based Policing; Human and Cultural Diversity; Implicit Bias

Private security practices

Policy and program implementation & litigation support for Law Enforcement & Correctional Agencies

## CURRICULUM DEVELOPMENT

Courses created and taught for the University of West Florida, Department of Criminology and Criminal Justice.:
- Police Use of Force and Intersectionality,
- The Use of Force in Criminal Justice,
- Race, Gender, Ethnicity & Crime,
- Homicide,
- Cold Case Investigation,
- Gangology,
- Serial Killers,
- Violence,
- Sex Crimes Investigation,

Developed and taught the graduate course in Terrorism and Homeland Security.
Developed the course Public Sector Ethics for the MPA program of the University of West Florida.
Developed and taught the Leadership course and the Governmental Innovation and Re-engineering course in MPA program.
Subject Matter Expert (SME) in development of criminal justice course for NIIT Limited, a global talent development company.
Subject Matter Expert (SME) in revision and development of graduate course in Criminology & Policy

## PROFESSIONAL SERVICE

Academic:
2022 – Member, Assistant Professor of Criminal Justice & Criminology search committee
2020 – 2021 University Growth & Development Committee
2020 – 2021 Diversity Work Group, College of Education and Professional Studies
2018 – 2019 Member, Chair of Criminology & Criminal Justice search committee
2018 – 2019 Member, Assistant Professor of Social Work search committee
2017 – 2018, Member, Police Chief search committee, University of West Florida
2017 - 2021, Advisory Board Committee, CCJ
2017 - 2021, Advisory Board Committee, MSA-PA
2016 – 2021, Graduate Admissions Committee, MSA programs

2016 – **Subject Matter Expert law enforcement** and **correctional practices for U.S. Navy's**
"Sailor 2025" High Velocity Training Design and Technologies Project
2016 – 2021, Ed.D. Committee Supervision/membership –
2016- 2021, Dissertation Peer Reviewer for College of Education and Professional Studies,
Dean's representative
2015-2016 College of Education and Professional Studies Task Force
2015 – Member, College of Education and Professional Studies, Community Engagement steering
committee
2015-2016 Member, Master of Public Administration Task Force
2014-2015 Vice-president of Administrative Services/Chief Financial Officer search
   committee
2014 – Member, UWF Dean search committee, College of Education and
   Professional Studies
2014 – 2020 Member, University Risk and Compliance Council
2014 – 2015 Task Force on establishment of University College
2013 – 2021, Adjunct Instructor Committee, CCJ
2013 – 2015 SACS COC Compliance Certification Team member
2013-2015-member, **Board of Trustees**, University of West Florida
2013-2015 - elected **Faculty Senate President**, UWF
2012 – 2021, Graduate Admissions Committee, MSCJ program
2012 – Member, Provost search committee
2010 – Elected to three-year term, **Faculty Senate**, University of West Florida
2011-2013 Chair, Planning and Special Issues Committee, Faculty Senate
2011 – 2019 University Safety and Security Council
2012 – President's Listening Group – Budget
2010-2019 – Judge, UWF Argo Invitational Mock Trial Tournament


International, National and Regional:
   2020-2024 U.S. Fulbright Specialist
   2018-present named **International Ambassador**, British Society of Criminology (BSC)
   2018-present ASIS International, PSC.2 Technical Committee evaluated the Conformity
      Assessment and Auditing Management Systems for Quality of Private Security Company
      Operations ANSI Standard.
   2017-present *Calibre Press*, research consultant, columnist; ancillaries author for
      ***Street Survival II***
   2015-present Criminal Investigation Research Network (CIRN)
   2010-present Homicide Research Working Group (HRWG), **Vice-President,**
      **2018-20, Publications Committee chair, IACP Research Liaison**
   1990-1996: National Law Enforcement and Corrections Technology Advisory
   Council (NLECTAC) to the Department of Justice; Corrections Sub-Committee.
   1987-present International Association of Chiefs of Police (IACP)
      1988-1998:  **Education & Training Committee**, International Association of Chiefs of
      Police
      2019-2020 Technology Working Group – Policy Center - IACP
      2019-2020 Confidential Informants Working Group – Policy Center - IACP
      2022- Electronic Control Weapons Working Group – Policy Center - IACP


Community:

2014 – 2021, Advisory Council, George Stone Technical College, Law Enforcement and
Corrections Academies
2011 – 2017, Gulf Coast Citizen Diplomacy Council, **Board of Directors, Secretary (2012-14)**,
  2009 – 2011 Gulf Coast Citizen Diplomacy Council - member
      2010 – **Citizen Diplomat of the Year**
2010 – 2012, Education Committee **Chair**, Florida Attorney General's Task Force on Gangs,
Escambia County region
2006 Homeland Security Task Force, City of Mobile, Alabama
2003- 2017: 2008-2010 **President** Favor House of Northwest Florida Domestic
  Violence Center, **Vice-president** and board member; former Personnel
  Committee **Chair**
2007- 2009: Pace Area Chamber of Commerce
2007- 2009: Navarre Area Chamber of Commerce
1996-2006: Navy League of Santa Rosa County Council. **President** from 1998-2002.
1987-2001:  Member, Kiwanis International
1998 **President** and Co-Founding Member Santa Rosa Sunrise Kiwanis
1996-2000: Board Member, Big Brothers Big Sisters of NW Florida:
      former Personnel Committee **Chair**
1996-2000: Board Member, Red Cross of NW Florida
1993-1995 Adopt-A-Family of Manatee County, FL
1988-1990 Cub Scouts of America, Den Leader


*Current or past member of or involvement with a number of professional organizations, including the
following*:

- International Law Enforcement Educators and Trainers Association
      (ILEETA), Staff Instructor
- American Correctional Association
- American Jail Association
- National Commission on Correctional Health Care (NCCHC); Certified Correctional
       Health Professional (CCHP)
- American Association of Suicidology; certified Psychological Autopsy Investigator
- American Psychology-Law Society; Research Committee
- International Homicide Investigators Association (IHIA)
- International Association for Identification (IAI)
- National Tactical Officers Association (NTOA)
- National Internal Affairs Investigators Association (NIAIA)
- Police Executive Research Forum (PERF)
- Associates Program Committee, California Emergency Management and
  Homeland Security Model Curriculum and Standards
- International Association for Correctional and Forensic Psychology (IACFP)
- CIT International
- Justice Research and Statistics Association (JRSA)
- First Judicial Circuit Law Enforcement Officers Association
- Florida Police Chiefs Association
- Florida Sheriff's Association
- Justice Research and Statistics Association (JRSA)
- Academy of Criminal Justice Science (ACJS)

- Council of Juvenile Justice Administrators (CJJA)
- Southern Criminal Justice Association (SCJA)
- American Society of Public Administration (ASPA)
- Academic Advisory Board of the Annual Editions: Drugs, Society, and Behavior

## AWARDS AND RECOGNITION

- **2018** *Carolyn Rebecca Block Award for Outstanding Contribution to Homicide or Lethal Violence Research by a Practitioner*. Homicide Research Working Group (HRWG)
- **2018-2020** named **International Ambassador**, British Society of Criminology (BSC)
- **2018-19** cycle Alternate Candidate– U.S. Fulbright Scholar Program for project to compare police investigative methods in the U.S. and U.K.
- **2017** Certificate of Appreciation, Outstanding Contributions – International Visitor Leadership Program, United States Department of State
- **2016** Nominee and Finalist, Distinguished Teaching Award, University of West Florida
- **2016** Professional Achievement Award, University of Maryland University College
- **2015** Faculty Excellence in Teaching Award nominee, University of West Florida
- **2013** Educator of the Year, Community Service and Partnerships, Colorado Technical University
- **2011** Distinguished Service Award, FavorHouse of NW Florida
- **2009-2010** Outstanding Citizen Diplomat of the Year, Gulf Coast Citizen Diplomacy Council
- **2009** Distinguished Teaching Award, University of West Florida
- **2007-08** Profiled in two CJ texts published; re-profiled in one 2013
- **1997** Law Enforcement Commendation Medal, S.A.R.
- **1996** Leadership Santa Rosa
- **1989** The Bradenton Herald "Rose" Award, for community work
- **1988** Leadership Manatee
- **1986** Deputy of the Month, Manatee Sheriff's Office, for saving the life of a fellow officer
- **1980** Officer of the Year, Longboat Key Police Department

## PEER-REVIEWED PUBLICATIONS

Buker, H., and Hough, R. M. Challenges, Overcoming Strategies, and Possible Considerations for the Future Implementation of Workload Based Police Patrol Staffing Analyses: A Methodological Commentary. *Police Science: Australia & New Zealand Journal of Evidence Based Policing, 7*(1), 30-39.

Hough, Richard Using Police as Mechanism of Self-Harm: Suicide by Cop and Psychological Autopsy. *Journal of Mental Health and Social Behaviors, 4*(1): 167 (2022)

Hough, Richard Administrative Evil and the Use of Deadly Force in Law Enforcement. *British Society of Criminology*, BSCN86-2021

Hough, Richard "The Investigation of Homicide", *Homicide Studies, 23*(2), 87-92, 2019. DOI: https://doi.org/10.1177/1088767919827348.

Hough, Richard, McCorkle, Kimberly, and Harper, Sarah "An Examination of Investigative Practices of Homicide Units in Florida", *Homicide Studies*. *23*(2), 175-194, 2019. DOI: https://doi.org/10.1177/1088767919828421.

Hough, Richard "Mental Chronometry and Officer Training" April 2017, *Law Enforcement Executive Forum*, *17*(2).

Hough, Richard "Mental Chronometry in Officer Involved Shootings" 2017, *Forensic Research & Criminology International Journal*, *4*(3): 00116. DOI: 10.15406/frcij.2017.04.00116.

Hough, Richard, and Tatum, Kimberly M. "Murder Investigation and the Media: Mutual Goals" 2014, *Law Enforcement Executive Forum*, *14*(3).

Hough, Richard, and Tatum, Kimberly M. "An examination of Florida policies on force continuums." *Policing: An International Journal of Police Management and Strategy*. Published, Spring, 2012.

Hough, Richard, and Tatum, Kimberly M. "Examining the Utility of the Use of Force Continuum: TASERs and Potential Liability," July, 2009, *Law Enforcement Executive Forum*.

Crow, Matt, Hough, Richard, Mosley, Jason, Smykla, John, and Tatum, Kimberly M. "Drunk and Alone in a K-Mart Parking Lot," Nov. 2008, *Journal of Criminal Justice Education*.

Clement, Keith, Hough, Richard, Jones, Brian, Mathis, John, and Simmons, Chip. "Partnering with a Purpose," November 2007 *Police Chief, 74*(11).

Hough, R. (2005, September). "Boosting student participation through distance learning." *Best practices in electronically delivered programs and courses*, v.3 (pp. 34).

Hough, R. (1991). "How Deep is Your Bench?": Managerial and Supervisory Law Enforcement Development" *Police Chief*.

Hough, R. (1991). "Organizational Grapevine: Friend or Foe?" *Police Chief*, *58*(5), pp. 49-50.

**Editorial Board,** *Homicide Studies*
**Editorial Board,** *Psychology and Behavioral Sciences*

**Guest Editor**; Special Edition on Investigations in *Homicide Studies*, 2019

Editorial Reviewer, *American Review of Public Administration*
Editorial Reviewer, *Public Integrity*
Editorial Reviewer, *Police Quarterly*
Editorial reviewer, *British Society of Criminology*
Editorial reviewer, *Policing: An International Journal of Police Management and Strategy*
Editorial reviewer, *International Journal of Sociology and Social Policy.*
Editorial reviewer, *Homicide Studies*
Editorial reviewer, *Forensic Research & Criminology International Journal*

Former editorial reviewer, *The Police Chief*

## Textbooks and book chapters

Hough, R. The criminal justice response to predatory violence, in, Predatory Violence, Springer Publishing (forthcoming)

Hough, R., McCorkle K. Homicide investigation in the U.S., in, The Routledge Handbook of Homicide Investigation (forthcoming)

Hough, R. *Criminal Investigations Today: The Essentials*. SAGE Publishing (2021).

Hough, R. *The Use of Force in Criminal Justice*. Routledge, Taylor & Francis Group (2018) (2nd ed. 2024).

Hough, R. & McCorkle, K. *American Homicide*. SAGE Publishing, 2016 (2nd ed. 2021).

Browne, D., Holloway, R., Hough, R., Martinez, M., McGovern, J. (Eds.). (2014). *Introduction to Criminal Justice*. USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Introduction to criminal justice. In Browne, D., Holloway, R., Hough, R., Martinez, M., McGovern, J. (Eds.), *Introduction to Criminal Justice* (pp. 1-19). USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Juvenile justice. In Browne, D., Holloway, R., Hough, R., Martinez, M., McGovern, J. (Eds.), *Introduction to Criminal Justice* (pp. 164-178). USA: Words of Wisdom, LLC. University Press.

Fitzgibbons, P., Hough, R., Kaminsky, I., Neumeyer, G., Newell, F., Newman, R. (Eds.). (2014). *Introduction to Corrections*. USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Legal issues in corrections. In Fitzgibbons, P., Hough, R., Kaminsky, I., Neumeyer, G., Newell, F., Newman, R. (Eds.). *Introduction to Corrections* (pp. 84-99) USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Juvenile corrections. In Fitzgibbons, P., Hough, R., Kaminsky, I., Neumeyer, G., Newell, F., Newman, R. (Eds.). *Introduction to Corrections* (pp. 144-159) USA: Words of Wisdom, LLC. University Press.

## Published Conference Proceedings

Hough, R. (2023). "The Challenges of Investigating Suicide by Cop,"Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R. & McCorkle, K. (2016). "Investigative Practices of Homicide Units," Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R. & Tatum, K. (2015). "An Examination of Investigative Practices of Homicide Units in Florida." Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R. & Tatum, K. (2013). "Take a Breath: a Pause to Prevent Escalation." Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R., & Tatum, K. (2012). "Confrontational Homicide." Conference Proceedings of the Homicide Research Working Group Annual Meeting.

**Technical Reports**

Hough, R. (in-progress) jail crowding causes, consequences, options in a southeastern county. Technical report for stake-holders

Buker, H. & Hough, R. (2020-21). Staffing Analysis, Pensacola Police Department

McCorkle, K., Goulette, N., Johnson, K., Hough, R. (2021) Validity study of a Florida pre-trial release instrument.

Tatum, K. & Hough, R. (2010). Escambia County Domestic Violence Fatality Review Team: Findings and Recommendations.

Hough, Richard. (2006). Total Quality Management in the Alabama Department of Youth Services, 2006. - Technical Report

**OTHER PUBLICATIONS**

Hough, R. (2020, May). Back to Basics: Again. *Calibre Press*.

Hough, R. (2020, March 20). Law Enforcement: The Original Social Distancers. *Calibre Press*.

Hough, R. (2018, November 13). Sucker Punched: Spontaneous assault & the "Elbow Test." *Calibre Press*.

Hough, R. (2018, June 15). Considering the Use of Force. *Calibre Press*.

Hough, R. (2018, March). Street-Level Decision-Making. *The ILEETA Journal*.

Hough, R. (2017, November 8). Fly High or Drop It By: The challenge of investigating shipped or mailed drugs. *Calibre Press*. Retrieved from https://www.calibrepress.com/2017/11/fly-high-drop/

Hough, R. (2017, April 26). The Future of Defensive Tactics. *Calibre Press*. Retrieved from https://www.calibrepress.com/2017/04/future-defensive-tactics/

Hough, R. & Tatum, K. (2015). An Examination of Investigative Practices of Homicide Units in Florida. A research note for the *Vidocq Society Journal*.

Hough, Richard M. (2011) Homicide entry for African Americans and Criminal Justice, an encyclopedia.

Tatum, K. & Hough, R. (2010). Escambia County Domestic Violence Fatality Review Team: Findings and Recommendations. – Technical Report

Former Quarterly column contributor to Corrections.com on Security Threat Groups and Gangs.

Hough, Richard.  (2007, December 24).  Safety in Numbers.  *Corrections Connection* Online journal

Hough, Richard.  (2004, August 30).  Security and Facility Management and Personnel:  A Critical Connection.  *Corrections Connection* Online journal

Hough, Richard.  (2003, August 18).  Correctional Facility Design:  Can You Get There from Here?  *Corrections Connection*.  Online journal

Hough, Richard. (1996). Kung Fu and the Cop. *Inside Kung Fu* magazine.

Hough, Richard. (1994). Going to the Ground. *Inside Kung Fu* magazine.

Forty+ textbook and prospectus reviews.

**Manuscripts under review:**


# RESEARCH IN PROGRESS

**Textbooks in progress:**

Hough, R. *The Use of Force in Criminal Justice*. Routledge, Taylor & Francis Group (2018) (2e coming 2024).

Hough, R. *Human Error and Training the Human Officer*.
Under development.

Hough, R. *Police Practices Today: The Essentials*.
Under development with proposal to SAGE Publishing.

Hough, R. *Conditions of Confinement in Juvenile Corrections*. Under development.

Hough, R. *Private Security, Public Police*. Under development.


**Other work in progress:**

Hough, R. Signs of Resistance, research project with *Calibre Press*

Hough, R. Pursuing Policy: Implementing and Explaining Vehicle and Foot Pursuit Policies

Hough, R. Drug-out Difficulties: Jail and Lock-Up Medication Challenges

Hough, R. Use of O.C. pepper spray in the juvenile detention setting. (manuscript in progress)

Hough, R. Graduate and undergraduate research with students developing and conducting research on officer movement and reaction during face-to-face interactions.

Hough, R. HOLMES and Watson: Contemporary Detectives and Technology. (manuscript in progress)

Hough, R. Murder Down the Block: Confrontational Homicide in Context.
(manuscript in progress)


## CONTINUING CRIMINAL JUSTICE EDUCATION

Completed more than 3,000 hours of advanced and in-service training including Florida Criminal Justice Executive Institute, Command School at the Institute for Police Technology and Management, Advanced Threat Assessment Academy (2011, 2019) Gavin de Becker, Internal Affairs Investigations DLG, Constitutional Use of Force by *Calibre Press*, The Investigation Management and Use of Lethal and Less Lethal Force by AELE, Psychological Autopsy certification training American Association of Suicidology, Excited Delirium Instructor by the Institute for the Prevention of In-Custody Death


## MEDIA
Frequently interviewed by news media on criminal justice topics.


## CONFERENCE PRESENTATIONS

Hough, R. (2023). "The Challenges of Classifying Suicide by Cop," Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, Richard M. Challenges Classifying Suicide by Cop (SbC). Homicide Research Working Group (HRWG) Annual Meeting, June 2023.

Hough, Richard M. Event Termination Response/Foot Pursuit; Public Policy/Public Administration segment. Florida Political Science Association, Annual Conference, April 2023.

Hough, Richard. Law Enforcement Policy Evolution: Response to Mass Shooting. Southeastern Conference on Public Administration. 2022 Annual conference.

Hough, Richard. Six Shootings in Sixty Minutes. 2022 International Association for Identification annual conference. July 2022.

Hough, Richard. Officer-Involved Shooting Policies. Southeastern Conference on Public Administration. September 2021.

Hough, Richard. Shots Fired! Was that you or me? Psychological and physiological factors in police shootings. Applied Cognitive Psychology in Forensic Settings, Queen Margaret University, Edinburgh, Scotland and the Scottish Institute for Policing Research. May 2021

Hough, Richard and Squires, Peter. Comparing TASER usage in the UK and the US. British Society of Criminology annual conference, 2020 (postponed)

Hough, Richard and James, Adrian. The Detective Dilemma. British Society of Criminology annual conference, 2020 (postponed)

Hough, Richard M., McCorkle, K., and Morales, N. Challenges to Homicide Investigations. Homicide Research Working Group (HRWG) Annual Meeting, May-June 2019.

Hough, Richard M. Public Integrity 20th Anniversary Symposium, Administrative Evil and the Use of Deadly Force in Law Enforcement. American Society of Public Administration, Annual Conference, March 2019. (Invited)

Hough, Richard M. The Policy Challenges of Drug Contraband in Jails and Detention Centers; Public Policy/Public Administration segment. Florida Political Science Association, Annual Conference, March 2019.

Hough, Richard M. Comparing U.S. and U.K. Detectives. American Society of Criminology (ASC) annual meeting, November 2018

Hough, Richard M. Logistics of the Mass Shooting Scene. Homicide Research Working Group (HRWG) Annual Meeting, June 2018.

Hough, Richard M. Street-Level Decision-Making. Annual international conference of the International Law Enforcement Educators and Trainers Association (ILEETA), March 2018.

Hough, Richard M. Administrative Evil and the Use of Deadly Force in Law Enforcement. American Society of Public Administration, Annual Conference, March 2018.

Hough, Richard M. The Policy of Force. Southeastern Conference on Public Administration, Annual Conference, October 2017.

Hough, Richard M. Police Lethal Force Frequency in the Culture of the Gun. British Society of Criminology, Annual Conference, July 2017.

Hough, Richard M. Chair and Discussant: Investigative Panel; presentation - Investigative Practices in Homicide. Effective homicide investigation outcomes: What is there besides clearance? Through the eyes of the beholder: The investigator's view of the good homicide investigation. Homicide Research Working Group (HRWG) Annual Meeting, June 2017.

Hough, Richard M. The Future of Physical Techniques in Defensive Tactics. Annual international conference of the International Law Enforcement Educators and Trainers Association (ILEETA), March 2017

Hough, Richard M. Homicide Investigations: Best Practices. Annual national conference of the Parents of Murdered Children (POMC), July 2016

Hough, Richard M. Participating with Criminal Justice Agencies. Annual national conference of the Parents of Murdered Children (POMC), July 2016

Hough, Richard M. Homicide Investigations: UK and USA Research Finding - Florida Homicide Investigative Practices. British Society of Criminology, Annual Conference, July 2016

Hough, Richard M. Chair and Discussant, Young People, Violence, and Homicide: American Homicide. British Society of Criminology, Annual Conference, July 2016

Hough, Richard M. Chair and Discussant: Investigative Practices in Homicide. Homicide Research Working Group (HRWG) Annual Meeting, June 2016.

Hough, Richard M. Florida Homicide Investigation Practices: Smaller Agency Perspective. Paper presented at the Academy of Criminal Justice Sciences (ACJS) Annual Meeting, March 2016.

Hough, Richard M. Investigating Florida Murder: Law Enforcement Practices, Southern Criminal Justice Association (SCJA) Annual Conference, September 2015

Hough, Richard M. Murder down the Block. Annual national conference of the Parents of Murdered Children (POMC), July 2015

Hough, Richard M. Participating with Criminal Justice Agencies and Fatality Review Teams. Annual national conference of the Parents of Murdered Children (POMC), July, 2015

Hough, Richard M. Neighborhood Violence Dynamics – Young Men and Violence. Crime Prevention Conference: Bridging the Gap. July 2015

Hough, Richard M. An Examination of Investigative Practices of Homicide Units in Florida. Homicide Research Working Group (HRWG) Annual Meeting, June 2015.

Hough, Richard M. Confrontational Violence and Homicide. Crime Prevention Conference: Bridging the Gap. August 2014

Hough, Richard M. Take a Breath: Confrontational Violence. Homicide Research Working Group (HRWG) Annual Meeting, June 2013

"Homicide in America: An Update." Chair and Discussant. Southern Criminal Justice Association (SCJA) Annual Conference, September 2012

Hough, Richard M. An Examination of Confrontational Homicide. Homicide Research Working Group (HRWG) Annual Meeting, June 2012

"I Didn't Come Here to Kill You, it Just Happened. An Examination of Homicides in a Southern Jurisdiction." Presented at the Southern Criminal Justice Association Annual Conference, October 2011.

"Developing a Model Policy: Law Enforcement Use of Force." Presented at the Southern Criminal Justice Association Annual Conference, September 2010.

"Domestic Violence Fatality Review Teams." Presentation at the Academy of Criminal Justice Sciences (ACJS) Annual Meeting, March 2009.

Hough, Richard M. Domestic Violence Community Coalitions, Southern Criminal Justice
Association (SCJA) Annual Conference, September 2008, *Law Enforcement Response to DV*

"Drunk and Alone in a Kmart Parking Lot: The Pedagogy of Simulations and Contemporary
Attitudes toward Drinking and Driving." Paper presented at the Academy of Criminal Justice
Sciences Annual Meeting, March 2008.

Hough, Richard M. Choosing Law Enforcement, Vocational Implications for Hispanics, Southern
Criminal Justice Association (SCJA) Annual Conference, September 2007

Hough, Richard M. Recruitment of Hispanic Law Enforcement Officers, Academy of Criminal
Justice Science (ACJS) Annual Conference, March 2007

Hough, Richard M. Domestic Violence, 3rd Annual Conflict Resolution Conference, University of
West Florida, February 2007

Hough, Richard M. Career Counseling Hispanics for Criminal Justice, Troy University Annual
Psychology Conference, April 2007

Hough, Richard M.  College Cops: No Looking Back. Presented at the International Association
of Chiefs of Police Annual Conference, October 1995.

Hough, Richard M. The Use of Mobile Data Terminals to Enhance Community Policing.
International Association of Chiefs of Police Annual Conference, October 1990.

Presented at the inaugural meeting of the Stop Turning Out Prisoners (STOP) of Florida
organization, June 1991.

Panelist with former Secretary of the Florida Department of Corrections Harry Singletary for
"Jails, Prisons and Community Corrections," 1993.

Presenter for Stetson Law School's annual Chiefs of Police Training conference on "Suicide
Prevention in Jails and Police Lock-ups," 1995.

Moderator and panelist for several seminars at the annual conference of the International
Association of Chief s of Police.


**INVITED PRESENTATIONS (Sample)**

2022 September, Dynamics of lethal and less-lethal force; suicide considerations. Defense
Counsel Get-Together, Florida Sheriffs Risk Fund.

2022 July, Active Shooters & Mass Assaults: Considerations That Impact Policy and Response,
Webinar for *CalibrePlus* Online Training

2022 March, Contemporary Criminal Investigation Practices, University of West Georgia

2021 October, Safety Practices for Social Work Professionals – Department of Social Work class
Fall 2021, University of West Florida

2021 Police Use of Force in the U.K and the U.S., International Law Enforcement Education and Training Association, Learning Lab, Season 4

2020 December Contemporary Policing for Pensacola Rotary

2020 October Police and Race for United Church of Christ, Tallahassee, FL

2020 Selected to present in a two-part webinar series on community policing to Mexican senior police and security officials. Project funded by the U.S. Department of State Bureau of Narcotics and Law Enforcement, the Police Professionalization Exchange Program (PPEP) provides opportunities for Mexican law enforcement professionals to increase their leadership and tactical skills.

2020 Police Use of Force and Intersectionality, Campus Conversations Series, University of West Florida.

2020 *Calibre Press* Webinar – Implicit Bias.

2020 University of North Carolina, Pembroke, Police Use of Force and Race.

2020 *Calibre Press* Webinar – Impossible Position: Enforcing Gubernatorial Decrees during COVID-19.

2020 *Calibre Press* Instructor Insights vodcast: Coronavirus and Law Enforcement.

2019 4th annual Too Good To Be True: Exploring representations of crime and violence conference, Salford University, England; American Police and the Media.

2019 Liverpool John Moores University, Liverpool, England - Major Case Investigations; Police Practices; Police Use of Force.

2019 Salford University, Manchester, England - Homicide Investigations.

2019 Edge Hill University, Ormskirk, England – Police Use of Force; Major Case Investigations.

2019 Policing Discussion Group, Oxford University, Oxford, England – Legitimacy, Accountability, Police Use of Force.

2019 University of Brighton, England – comparative policing; human resources (HR) practices in policing; criminal investigations; use of force.

2019 Edinburgh University Jiu Jitsu Club, Scotland – weapons defense; police use of force (hands-on).

2019 Edinburgh Napier University, Scotland – American Criminal Justice System; Police Use of Force; Stop and Frisk

2019 Canterbury Christ Church University, England – Comparative Policing Systems; Police Use of Force.

2019 Hough, Richard M. **(Intimate partner violence and protecting the rights of women and children subject matter expert)** Conducted briefing on U.S. efforts to empower women and combat violence for **Department of State's International Visitor Leadership Program for delegation from Bangladesh, India, and Pakistan.**

2019 Hough, Richard M. **(The role of community colleges and vocational colleges in the U.S. subject matter expert)** Conducted briefing on U.S. vocational education, curriculum development, workforce development, the importance of partnerships, and on-line and distance learning for **Department of State's International Visitor Leadership Program for delegation from the People's Republic of China.**

2019 Hough, Richard M. **(Intimate partner violence and child abuse subject matter expert)** Conducted briefing on U.S. efforts to empower women and combat violence for **Department of State's International Visitor Leadership Program for one of the 2019 Women of Courage named by the Secretary of State**. Dr. Kimberly McCorkle and I briefed the honoree, Ms. Marini de Livera of **Sri Lanka**, and included six of our students so that they might benefit from the insights of the discussion and Ms. de Livera's work with women and child victims of crime.

2018 Hough, Richard 4th Amendment - Presented remarks for Constitution Day to Department of Government students and faculty, University of West Florida.

2018 Hough, Richard M. **(Gendered violence and U.S. criminal justice system subject matter expert)** Conducted briefing on U.S. police investigative methods for Police Professionalization Exchange Program for **Mexico** (PPEP), a program of the U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs (INL), through the U.S. Embassy in Mexico.

2018 Hough, Richard M. **(Intimate partner violence and policy subject matter expert)** Conducted briefing on U.S. police investigative methods for Department of State's International Visitor Leadership Program for **Japan**.

2018 Hough, Richard M. **(Intimate partner violence and child abduction subject matter expert)** Conducted briefing on U.S. efforts to empower women and combat violence for Department of State's International Visitor Leadership Program for one of the 2018 Women of Courage named by the Secretary of State. Dr. Kimberly McCorkle and I briefed the honoree, Dr. Feride Rushiti of **Kosovo**, and included eight of our students so that they might benefit from the insights of the discussion and Dr. Rushiti's work with torture victims.

2017 Hough, Richard **(homicide and investigations subject matter expert)** Interview and appearance Season Five episode of Investigation Discovery channel's series *Evil Twins*.

2017 Hough, Richard M. **(Intimate partner violence and homicide subject matter expert)** Conducted briefing on Women's' Rights and Intimate Partner Violence and Homicide for Department of State's International Visitor Leadership Program for 19 political and community representatives from **Argentina, Bolivia, Chile, Cuba, Ecuador, El Salvador, Equatorial Guinea, Guatemala, Honduras, Mexico, and Venezuela**.

2016 Hough, Richard M. **Safety in the Field**. Undergraduate and Graduate *Social Work Leadership* and Practices classes, University of West Florida.

2016 Hough, Richard M. presentation to Capstone Criminal Justice class on how to interview for a professional position, University of West Florida.

2015 Hough, Richard M. presentation to Public Relations class on law enforcement and public relations, guest of President Saunders, University of West Florida.

2015 Hough, Richard M. **(Police practices subject matter expert)** Conducted U.S. State Department wrap-up session for the National Professional Program for 11 police and community activist representatives from **Argentina, Colombia, Ecuador, Honduras, Nicaragua, Peru, and Venezuela**.

2015 Hough, Richard M. Murder Down the Block. Annual Conference of the Parents of Murdered Children (POMC).

2015 Hough, Richard M. Participating with Criminal Justice Agencies and Fatality Review Teams. Annual Conference of the Parents of Murdered Children (POMC).

2013 Hough, Richard M. Safety in the Field. Graduate *Social Work Leadership* class, University of West Florida.

2014    Domestic Violence in the Workplace. Presented to the Department of State's International Visitor Leadership Program Delegation from **Afghanistan** exploring Women's Economic Empowerment.

2013    Children in the U. S. Justice System. Presented to the Department of State's International Visitor Leadership Program Delegation from **Uruguay, Rwanda, Poland, Japan, Egypt, and Trinidad and Tobago**.

2012    Domestic Violence and the Legal System. Presented to the Department of State's International Visitor Leadership Program Delegation from **Afghanistan, Uzbekistan, India** and other countries exploring Women as Political and Economic Leaders.

2012    Law Enforcement Approaches to Domestic Violence. Presented to the Department of State's International Visitor Leadership Program Delegation from **Chile**.

2012    Innovations in U.S. Police Strategy. Presented to the Department of State's International Visitor Leadership Program Delegation from **Moldova**.

2011 Hough, Richard M. The CSI Effect: What we can and cannot do. *Science Friday Series*, NW Florida State College.

2011 Hough, Richard M. Session Chair and Discussant Facilitator, Homicide Research Working Group, Annual Conference.

2011 Hough, Richard M. Domestic Violence Training Forum, University of West Florida, *Threat Assessment*.

2011 Hough, Richard M. Domestic Violence, 7th Annual Conflict Resolution Conference, University of West Florida, *Workplace Violence*.

2011   Domestic Violence Fatality Review Team Report: Findings and Recommendations. Presentation to regional law enforcement agency CEO's.

2011   Domestic Violence Fatality Review Team Report: Findings and Recommendations. Presentation to the League of Women Voters.

2011   Combating Domestic Violence and Violence against Women and Children. Presented to the Department of State's International Visitor Leadership Program Delegation from **Panama**.

2011   Fatality Review Teams and Data Collection. Presented to the Department of State's International Visitor Leadership Program Delegation from **Uzbekistan** exploring Criminal Justice and Forensic Science Innovation.

2010 Fighting Gender Based Violence. Presented to Department of State's International Visitor Leadership Program Delegation from **Pakistan**.

2010 Domestic Violence and Fatality Review Teams. Conducted briefing on U.S. efforts to empower women and combat violence for **Department of State's International Visitor Leadership Program for one of the 2019 Women of Courage named by the Secretary of State; Shukria Asil, Afghanistan**.

2010 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Department of State's International Visitor Leadership Program international delegation – **Morocco**.

2010 Hough, Richard M. Domestic Violence Training Forum, University of West Florida, *Interviewing the Child Victim or Witness*.

2010 Hough, Richard M. Domestic Violence, 6th Annual Conflict Resolution Conference, University of West Florida, *Conflict Resolution at the Moment of Crisis: Police Response and Intervention*. How American law enforcement officers arrive, assess, and conduct safe interventions to deescalate potentially violent situations.

2010 Research Presentation and Training for international delegation, *Intimate Partner Violence* – **Russia**.

2010 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Presented to the Department of State's International Visitor Leadership Program international **delegation – West Bank**.

2010 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Presented to the Department of State's International Visitor Leadership Program international **delegation – Argentina**.

2009 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Presented to the Department of State's International Visitor Leadership Program international **delegation – Romania**.

2009 Hough, Richard M. Law Enforcement Response to Domestic Violence, 5th Annual Conflict Resolution Conference, University of West Florida.

2008 Hough, Richard M. Law Enforcement Response to Domestic Violence, 4th Annual Conflict Resolution Conference, University of West Florida.

2008 Verbal De-escalation and Conflict Resolution, FavorHouse of NW Florida.

1990-91 Guest Lecturer, twice, John F. Kennedy School of Government, Harvard University. Title: Interviewing in Social Work and Law Enforcement.

More than fifty invited presentations on various public safety topics to civic, law enforcement, and not for profit organizations.

**EXPERT WITNESS AND LITIGATION SUPPORT CONSULTANT- Past Four Years testimony;
Rule 26**

2023 Retained for Expert Witness services, Settle v Escambia County Florida Sheriff's Office.
Police practices; lethal use of force (defendant) [deposition February 2024]

2023 State of Florida re: Deputy Sheriffs, Police Practices; use of deadly force [Grand Jury
testimony, January 2024]

2022 Retained for Expert Witness services, Estate of Cedric Lofton (Teetz) v Sedgwick KS
Juvenile Intake and Assessment (defendant) [deposition November 2023]

2023 Davis v Orange County FL Sheriff's Office. Police practices; arrest; use of force (defendant)
[deposition October 2023]

2023 Retained for Expert Witness services, Tsompanidis v. Tallahassee Community College,
Florida. Defensive Tactics training practices (defendant) [trial September 2023]

2023 Retained for Expert Witness services, Sexton v Bay County Florida Sheriff's Office. Police
practices; arrest, vehicle pursuit (defendant) [deposition May 2023]

2023 Retained for Expert Witness services, Lisa Vera v Orange County Florida Sheriff's Office
Police practices (defendant) [deposition March 2023]

2023 Retained for Expert Witness services, David Perez v St. John's County Florida Sheriff's
Office. Police practices; narcotics arrest, use of force (defendant) [deposition October 2023]

2022 Retained for Expert Witness services, Nicole Rulli v. City of Pittsburgh, PA. Case No.: 2:20-
cv-00965 Police practices; crowd control, use of force. (plaintiff) [deposition January 13, 2023]

2022 Retained for Expert Witness services, State v. Casado, regarding stand your ground (SYG)
involved shooting. Office of the State Attorney, Florida's 7th Judicial Circuit. (prosecution)
[deposition November 2022] [hearing November 2022]

2022 Retained for Expert Witness services, Donald Michael Outlaw v. City of Philadelphia, et
al., Civil Action No.:  21-1290. Police practices; homicide investigation, investigator training
(defendant) [deposition October 2022] [hearing November 2022]

2022 Retained for Expert Witness services, Ronnie Gaines v. Chip Simmons, Sheriff, Escambia
County, Florida, Drake Fawcett, Emilee Bright, Brad Baker. Case No.: 3:22-cv-00635-TKW-EMT
Police practices; traffic stops; presumptive drug tests (defendant) [deposition August 2022]

2022 Retained for Expert Witness services, Taylor et al. v. Sheriff Chris Nocco, Pasco County,
Florida. Case No.: 8:21-cv-00555-SDM-CPT Intelligence-Led Policing (defendant) [deposition
April 2022]

2021 Retained for Expert Witness services, Wade v. Miami Beach Police Department, Case No.
1:21-cv-22619-RNS. Police practices; use of force (defendant) [deposition July 2022]

2021 Retained for Expert Witness services, Altagracia Banuchi, Estate of Edward Foster v. City of Homestead and Anthony Green, Case 1:18-cv-23711-Scola Police investigative policies and practices, crime scene procedures. (defendant) [deposition March 2022]

2021 Retained for Expert Witness services, George Gerardi v. Sheriff of Lake County in his official capacity and Deputy Cleghorn, in his individual capacity, Case 5:20-cv-00517-RBD-PRL Corrections policies and practices, use of restraints. policies and practices. (defendant) [trial October 2022]

2021 Retained for Expert Witness services, Ronald Fitts v. City of Selma et al., Case Number: 2:20-CV-00322-JB-MU Police practices, K-9, policies. (defendant) [deposition October 2021]

2021 Retained for Expert Witness services, Celia Myers v. The City of Cape Coral, Florida, et al.; Case No. 2:20-CV-450-JLB-MRM Police practices; arrest; use of force. (defendant) [depositions January 2022, February 2022]

2021 Retained for Expert Witness services, Yolaisy Perez/ Estate of Lester Machado v. City of Hialeah et al., Case Number: 1:19-cv-24047-MGC Police practices; agency policies; pursuit; use of force – lethal. (defendant) [deposition September 2021]

2021 Retained for Expert Witness services, Canaan v Orange County Florida Sheriff's Office, et al. Case No.: 6:21-cv-00149-WWB-GKJ Police practices; agency policies; pursuit; use of force – lethal. (defendant) [deposition September 2022]

2021 Retained for Expert Witness services, McKinnon v. City of Sanford, Florida et al., Case Number: 6:20-cv-01358-PGB-EJK Police practices. (defendant) [deposition September 2021]

2021 Retained for Expert Witness services, Dempsey v. Sheriff Tommy Ford, et al. Case No.: 5:21-cv- 0134-TKW-MJF Inmate death; jail practices; policies; healthcare. (defendant) [deposition testimony November 2022]

2021 Retained for Expert Witness services, Keith Taig v. City of Vero Beach, Florida Case 9:21-cv-80391-DMM Police practices; criminal case investigation; sex trafficking. (defendant) [deposition August 2021]

2021 Retained for Expert Witness services, Rodriguez-Bonilla v. City of West Melbourne, Florida Case No. 6:20-cv-02235 Police practices; Baker Act; agency policies; pursuit; training. (defendant) [deposition September 2022]

2021 Retained for Expert Witness services, J.T., a minor, by and through his parents and natural guardians, Jessica Thompson and Cory Thompson v. School Board of Osceola County, Florida and Russell Gibson, Sheriff of Osceola County, Florida. Case No.: 6:19-cv-1738 Police practices; ASD juvenile Baker Act. (defendant) [deposition May 2021]

2021 Retained for Expert Witness services, Christopher Redding v. Deputy Jason Popovich. Case No: 6:21-cv-383-PGB-DCI Police practices; use of lethal force; training (defendant) [deposition April 2022]

2021 Retained for Expert Witness services, Viridiana Silva vs. City of Orlando et al., Case No.:
6:20-cv-782 Police practices; use of force – lethal. (defendant) [deposition May 2021]

2021 Retained for Expert Witness services, Estate of Cardell Vance v. Homer Deloach, Sheriff,
Putnam County Sheriff's Office, et al. Case No. 3:19-cv-00999-J-39MCR Police practices; agency
policies; pursuit; use of force – lethal. (defendant) [deposition May 2021]

2021 Retained for Expert Witness services, Carl Gutzmer v. David Shoar, Sheriff, St. John's
Sheriff's Office Case No.: 2016-CA-001334 Police practices; IPV/DV; use of force – TASER.
(defendant) [trial testimony April 2021]

2021 Retained for Expert Witness services, Clemente Javier Aguirre-Jarquin v. Dennis Lemma,
Sheriff, Seminole County, et al. Case No. 20-CV-00025 Police practices; crime scene procedures,
major case investigation – homicide. (defendant) [deposition March 2022]

2021 Retained for Expert Witness services, Estate of John C. Young v. David Morgan, Sheriff,
Escambia County, et al. Case No. 3:20-CV-5506-MCR-EMT Police practices; agency policies;
use of force – lethal. (defendant) [deposition June 2021]

2020 Retained for Expert Witness services, Andrade, Ashley Lynn v. Carmine Marceno and
LCSO and John Clark; EV2018069020 Police practices; use of force. (defendant) [deposition
September 2021]

2020 Retained for Expert Witness services, Russo v. City of Daytona Beach, Florida Case NO.:
2018-30906-CICI. Law enforcement practices; use of force TASER. (defendant) [hearing
testimony July 2021]

2020 Retained for Expert Witness services, Sachetta v. Lake County Sheriff's Office Florida et al.,
Case 5:19-cv-00561-JSM-PRL, Jail death, jail practices. (defendant) [deposition September 2020]

2020 Retained for Expert Witness services, Landau, Glenn et al. v. City of Daytona Beach Florida,
et al., Case No.: 6:19-CV-495-ORL-41-LRH, Investigations; police practices. (defendant)
[deposition June 2020]

2020 Retained for Expert Witness services, Booker v. City of Orlando, Florida Case No.: 6:19-cv-
773-Orl-37DCI. Police practices; use of force. (defendant) [deposition, April 2020]

2020 Retained for Expert Witness services, Geerts et al. v. Rutherford County, Tennessee 3:17-cv-
01014. Juvenile detention practices; juvenile justice. (defendant) [deposition, May 2020]

2019 Jane Doe v. Town of Greenwich, Connecticut Det. Sgt. Reeves, and Det.
Rondini. Case No.: 3:18-cv-01322-KAD. Investigations; police practices. (defendant) [deposition,
May 2020]

2019 Retained for Expert Witness services, Carter v. Mina, Orlando Florida Police Department et
al. Law enforcement practices; agency policies; pursuit; Intimate Partner Violence; use of force,
OC/TASER. (defendant) [deposition, May 2020]

2019 Retained for Expert Witness services, Fludd v. Town of Greenwich, Connecticut. Law enforcement practices; investigations; human resources; implicit bias. (defendant) [deposition, March 2021]

2019 Retained for Expert Witness services, G.H. et al. v. Florida Department of Juvenile Justice. Juvenile detention; agency policies; pursuit; conditions of confinement; behavioral confinement. (defendant) [deposition March 2022]

2019 Retained for Expert Witness services, Baker v. City of Punta Gorda, Florida Case No.: 18-CA-840. Law enforcement practices; use of force. (defendant) [deposition, March 2020]

2019 Retained for Expert Witness services, Bush v. City of Daytona Beach, Florida Case No.: 2018-30034-CICI. Law enforcement practices; home invasion investigation. (defendant) [deposition, February 2020]

2019 Retained for Expert Witness services, Maurice Leman Jones v. Mina, in his official capacity as Sheriff of Orange County, Florida, Case No.: 2018-CA-005828-O. Law enforcement practices; vehicle stop. (defendant) [deposition, September 2022]

2019 Retained for Expert Witness services, Harris v. Rambosk et al. Case No. 2:18-cv-00017-JES-MRM, U.S. District Court, Middle District of Florida. Subject Matter Expert: Law enforcement practices; use of force. (defendant) [trial testimony December 2021]