UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KARY JARVIS,

     Plaintiff,

v.                                                            Case No: 6:23-cv-508-JSS-RMN

CITY OF DAYTONA BEACH,
MARVILLE TUCKER, and JAMES
MACKENZIE,

     Defendants.

_____/

## ORDER

Plaintiff, Kary Jarvis, and Defendants, the City of Daytona Beach and Officers Marville Tucker and James Mackenzie, filed cross motions for summary judgment under Federal Rule of Civil Procedure 56.  (Dkts. 72, 88, & 91.)  For the reasons explained below, Plaintiff's motion is denied, the City's motion is granted, and the motion filed by Officers Tucker and Mackenzie is granted in part and denied in part.

## BACKGROUND[1]

### A. Factual History

On October 23, 2020, at approximately 4:50 p.m., an anonymous person called 9-1-1 to report a suspicious vehicle in the parking lot of an apartment complex. (Dkt. 85-6 at 1.)  The caller indicated that the vehicle had been there ten minutes, and there were between six to ten people around the vehicle. (*Id*.)  The caller further indicated the vehicle was a black or navy-blue Mitsubishi and that they saw a white male who appeared to be in his forties walking around the vehicle. (*Id*.)  The man had tattoos on his arm, wore a red tank top, black basketball shorts, white shoes, and was carrying a backpack. (*Id*.)  Based on the call, the dispatcher characterized the incident as possibly narcotics related. (*Id*.)

Defendants Officers James Mackenzie and Marville Tucker were dispatched to respond to the call. (Tucker Dep., Dkt. 72-3 at 6:22.)  According to Officer Tucker, upon his arrival at the scene, a vehicle matching the caller's description passed him, so he turned around and advised Officer Mackenzie about the vehicle. (*Id*. at 6:24–7:2.)  Officer Mackenzie then saw the vehicle at a nearby gas station. (*Id*. at 7:2–7:5.)  The driver had exited the vehicle to pump gas. (*See id*.)  Officer Tucker joined Officer Mackenzie at the gas station to observe the vehicle's driver. (*Id*.)  Officer Mackenzie

---

[1] The following facts are taken from the Computer-Aided Dispatch (CAD) Report (Dkt. 85-6), the body-worn camera footage of Officers Marville Tucker (Dkt. 72-9) and Officer James Mackenzie (Dkt. 72-10), the Deposition of Officer Marville Tucker (Dkt. 72-3), and the record (Dkt. 31).  The facts and all reasonable inferences are viewed in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

asserts that as the vehicle was leaving the gas station, he observed the driver run a stop bar and as a result, he initiated a traffic stop. (*Id.* at 7:5–7:9.) Plaintiff was pulled over for failure to come to a complete stop at a stop bar. (*Id.* at 7:10–7:15.) Both officers approached the vehicle, with Officer Tucker on the driver's side and Officer Mackenzie on the passenger side. (Tucker Body-Worn Camera (BWC), Dkt. 72-9 at 00:30–00:37.) Officer Tucker informed Plaintiff that he was stopped for failure to stop at a stop bar and then asked Plaintiff for his license and registration. (*Id.* at 00:37–00:48.) Plaintiff retrieved his license, registration, and proof of insurance, confirmed that he had just left the gas station, and reported that he was at the apartment complex where the officers had received a call concerning a suspicious vehicle. (*Id.* at 00:46–00:49.) The officers asked Plaintiff if he had any weapons, and Officer Mackenzie noticed a knife in plain view. (*Id.* at 01:20–01:39, Mackenzie BWC, Dkt. 72-10 at 01:26–01:35.) Officer Tucker asked Plaintiff whom he was visiting at the apartment complex, Plaintiff responded, and Officer Tucker walked back to his patrol car to run Plaintiff's information. (Tucker BWC, Dkt. 72-9 at 01:49–2:10.)

While Officer Tucker verified Plaintiff's information, Plaintiff initiated a conversation with Officer Mackenzie. (Mackenzie BWC, Dkt. 72-10 at 02:40–03:25.) During the conversation, Plaintiff informed Officer Mackenzie that he recently completed a six-year sentence for a drug-related offense. (*Id.*) Plaintiff also informed Officer Mackenzie that he previously served a thirteen-year sentence for drug-related offenses. (*Id.*) Plaintiff maintained, however, that he was gainfully employed, remaining crime-free, and was not under conditions of supervision. (*Id.* at 03:25–

04:06; 04:32–04:43.)  Plaintiff also stated that he had no weapons in his car. (*Id.* at 05:18–05:30.)  Approximately three minutes later, Officer Tucker gave Plaintiff a warning citation and returned Plaintiff's license, registration, and proof of insurance. (Tucker BWC, Dkt. 72-9 at 08:06–08:37; 08:37–08:43.)

Immediately after handing Plaintiff the citation, Officer Tucker asked if he had anything in the car that he needed to worry about, and Plaintiff said no.  (*Id.* at 08:44–08:54).  Officer Tucker then asked for Plaintiff's consent to search the car.  (*Id.* at 08:48–09:00.)  Plaintiff did not consent to a search.  (*Id.*)  Although Plaintiff continued to refuse consent, Officer Mackenzie asked, "So you said we can search the car?"  (*Id.*)  Plaintiff persisted in responding negatively.  (*Id.*)  Nevertheless, Officer Mackenzie stated "okay, well here's the thing while my partner was behind you prior to activating his lights and sirens he observed furtive movements which is movements into certain areas so we're going to check where those movements were and only where those movements were okay, can you step out of the vehicle please." (Mackenzie BWC, Dkt. 72-10 at 08:45–09:44.)  Following this exchange, Officer Mackenzie asked Plaintiff to step out of the vehicle numerous times, and Officer Tucker opened Plaintiff's vehicle door.  (*Id.* at 09:44–10:15.)  Plaintiff then stepped out of the car. (Tucker BWC, Dkt. 72-9 at 10:15–10:18.)  Officer Tucker instructed Plaintiff to stand behind his vehicle.  (*Id.* at 10:18–10:25.)  Officer Mackenzie attempted to search the vehicle and denied Plaintiff's request to observe the search.  (*Id.* at 10:18–10:29.)  Plaintiff reiterated that he did nothing wrong and asked to speak with the officers' supervisor.  (*Id.* at 10:29–10:58.)  Thereafter, Plaintiff reentered his vehicle and again

- 4 -

informed the officers that they could not search it.  (*Id.* at 10:58–11:03.)  The officers attempted to grab Plaintiff out of the vehicle, but before they could do so, Plaintiff—with the driver side door still open—drove off with the officers hanging from the vehicle.  (*Id.* at 11:03–11:55, Mackenzie BWC, Dkt. 72-10 at 11:05–12:50.)  Officer Mackenzie was able to dislodge himself from the vehicle as it drove away, but Officer Tucker hung on to the vehicle as it moved down the road.  (Mackenzie BWC, Dkt. 72-10 at 11:05–12:50.)  Ultimately, the vehicle crashed in an embankment.  (*Id.*)

Plaintiff was arrested.  (Dkt. 85-5.)  After his arrest, several officers conducted an inventory search of Plaintiff's vehicle.  (Tucker Dep., Dkt. 72-3 at 16:3–7, Mackenzie Dep., Dkt. 72-5 at 78:6–79:2.)  This search led to the discovery of knives, a THC oil vape pen, 5.6 grams of heroin, a white scraper with a white powdery substance, and a black plastic sealer.  (Dkt. 85-5 at 3.)  Following the encounter and search, Plaintiff was charged with: (1) two counts of aggravated battery on a law enforcement officer, (2) aggravated fleeing/eluding law enforcement, (3) resisting an officer with violence, (4) possession of THC Oil, (5) possession of drug paraphernalia, (6) trafficking in a controlled substance (heroin), (7) unlicensed carrying of a concealed weapon, and (8) destroying/tampering with or fabricating physical evidence.  (Dkt. 85-5.)  On December 2, 2020, the state's attorney's office filed an information.  (Dkt. 31-1.)  On October 21, 2021, a state court judge granted Plaintiff's motion to suppress evidence obtained from the search of the car.  (Dkt. 72-6.)  In January 2022, the state's attorney's office terminated the criminal proceedings against Plaintiff in his favor. (Dkt. 31-4, 31-5, 53.)

### B. Procedural History

On March 20, 2023, Defendants removed this case from state court.  Plaintiff's Complaint (Dkt. 1) seeks damages against the officers and the City for the following claims: state law false arrest against all Defendants (Count 1); false arrest pursuant to 42 U.S.C. § 1983 against the City (Count 2); false arrest pursuant to 42 U.S.C. § 1983 against the officers (Count 3); unlawful detention and search pursuant to 42 U.S.C. § 1983 against the City (Count 4); unlawful detention and search pursuant to 42 U.S.C. § 1983 against the officers (Count 5); municipal liability pursuant to 42 U.S.C. § 1983 against the City (Count 6); state law invasion of privacy against the Officers (Count 7); state law invasion of privacy against the City (Count 8); invasion of privacy pursuant to 42 U.S.C. § 1983 against the officers (Count 9); excessive force pursuant to 42 U.S.C. § 1983 against the officers (Count 10); malicious prosecution pursuant to 42 U.S.C. § 1983 against the officers (Count 11); malicious prosecution pursuant to state law against the officers (Count 12); state law negligence against the City (Count 13); state law vicarious liability assault against the City (Count 14); and state law conversion against the officers (Count 15).

Plaintiff moves for partial summary judgment on Counts 1, 3, 5, 7, 9, 10, 11, and 12. (Dkt. 72.)  Defendant the City of Daytona Beach filed a response in opposition (Dkt. 83.)  Plaintiff filed a reply, (Dkt. 97).  Defendants Marville Tucker and James Mackenzie filed a response in opposition.  (Dkt. 86.)  Plaintiff filed a reply (Dkt. 96). Defendants Marville Tucker and James Mackenzie move for summary judgment on Counts 1, 3, 5, 7, 9, 10, 11, 12, and 15. (Dkt. 88.)  Plaintiff filed a response in

opposition.  (Dkt. 101.)  Defendant the City of Daytona Beach moves for summary judgment on all counts.  (Dkt. 91.)  Plaintiff filed a response in opposition.  (Dkt. 102.)

## APPLICABLE STANDARDS

Granting summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is considered "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the [record], which it believes demonstrate the absence of a genuine issue of material fact.'" *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the movant shows that no evidence supports the non-moving party's case, "[t]he burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir. 1993)).

In determining whether a genuine dispute of material fact exists, "courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion," and "[a]ll reasonable doubts about the facts should be

resolved in favor of" the non-moving party. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (citing *Clemons v. Dougherty County*, 684 F.2d 1365, 1368–69 (11th Cir. 1982)). "If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations and citation omitted). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021) (quotations and citations omitted). "After a government official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff . . . ." *Id.* (citing *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998)).

To determine whether qualified immunity applies, courts consider (i) whether the plaintiff can "establish a constitutional violation" and (ii) "whether the right

violated was clearly established." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010) (quotations and citation omitted).  Thus, a plaintiff "must establish that a reasonable jury could find that [the officers] violated [plaintiff's] constitutional right, and that his right was 'clearly established' when [the officers] violated it." *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)).  The court views the facts in the light most favorable to the plaintiff.  *Id*.  "[E]ntitlement to qualified immunity is for the court to decide as a matter of law." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018).  "If, at the summary judgment stage, the evidence construed in the light most favorable to the plaintiff shows that there are facts inconsistent with granting qualified immunity, then the case and the qualified[-]immunity defense proceed to trial." *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020).

The parties do not dispute that the officers were acting within the scope of their discretionary authority when the alleged misconduct occurred.  (*See generally* Dkts. 72 & 88.)  Therefore, to survive the officers' qualified-immunity defense, Plaintiff must establish constitutional violations for his claims and must establish that the right violated as to each claim was clearly established under the law.

Because the court concludes that the officers are not entitled to qualified immunity for the seizure of Plaintiff, the court first discusses that claim and then turns to Plaintiff's remaining claims.

## A. Unlawful Detention and Search – Officers (Count 5)

### 1. Constitutional Violation

Plaintiff moves for summary judgment on his unlawful detention and search claim brought against the officers pursuant to 42 U.S.C. § 1983 in Count 5. (Dkt. 72 at 1, 12–18.) The officers also move for summary judgment as to this count based on qualified immunity. (Dkt. 88 at 1, 15–18.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by [law enforcement officers], even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the [Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809 (1996) (quotation omitted); *see United States v. Braddy*, 11 F.4th 1298, 1308 (11th Cir. 2021) ("A traffic stop for a suspected violation of law is considered a seizure of the vehicle's occupant and must be conducted in accordance with the Fourth Amendment."). Under the Fourth Amendment, a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *accord Rodriguez v. United States*, 575 U.S. 348, 350 (2015) ("A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). A stop's legitimate mission has two components: (1) "address[ing] the traffic violation" and (2) "attend[ing] to related safety concerns." *Rodriguez*, 575 U.S. at 354. While "an officer is free to undertake activities unrelated

- 10 -

to the traffic stop's mission *during* the stop's already-permissible duration . . . the officer may not prolong the stop." *Baxter v. Roberts*, 54 F.4th 1241, 1259 (11th Cir. 2022); *see Rodriguez*, 575 U.S. at 354 ("[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention[.]"). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 575 U.S. at 355 (quoting *Caballes,* 543 U.S. at 408). "Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 658–660 (1979)). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* (citing *Prouse,* 440 U.S. at 658–659). When evaluating whether a specific search or seizure is reasonable under the given circumstances, a court must evaluate the facts under an objective standard. *Terry*, 392 U.S. 1, 21–22. In other words, the court must evaluate whether a reasonable objective officer would believe the action taken was appropriate. *Id.*

### a) Traffic Stop

Defendant law enforcement officers argue that they did not unlawfully seize Plaintiff in violation of the Fourth Amendment when they confirmed that his license and registration were active, confirmed that he had no outstanding warrants, and gave him his license, registration, and proof of insurance back along with a warning citation,

but prevented him from leaving until they searched his surrounding area, because the initial traffic stop was winding down but was not over.  (Dkt. 86 at 13–14; Dkt. 88 at 16–17.)  In response, Plaintiff argues that the officers completed the traffic stop when Plaintiff received the warning citation and that the officers prolonged the completed traffic stop to investigate other crimes in violation of the Fourth Amendment and in contravention of *Rodriguez* when they forced Plaintiff out of his vehicle to perform the search.  (Dkt. 101 at 7.)

"A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350; *United States v. Campbell*, 26 F.4th 860, 884 (11th Cir. 2020) (recognizing that pursuant to *Rodriguez* the standard for deciding whether an officer unlawfully prolonged stop depends on whether the officer "(1) conduct[ed] an unrelated inquiry aimed at investigating other crimes[,] (2) that adds time to the stop[,] (3) without reasonable suspicion.")  In *Rodriguez*, a K-9 officer pulled the plaintiff over for swerving onto the shoulder in violation of Nebraska law.  575 U.S. at 351.  After the officer checked the driver's license, he gave him a warning for the traffic offense and returned his license, registration, and proof of insurance.  *Id.* at 351–52.  Nevertheless, the officer did not consider the driver free to leave and asked him for his consent to walk a K-9 officer around the driver's vehicle.  *Id.* at 352.  The driver said no.  *Id.*  The officer then instructed the driver to turn off the ignition, exit the vehicle, and stand in front of the officer's patrol car while a second officer arrived with a K-9 officer.  *Id.*  The K-9 officer alerted to the presence of drugs, and a search of the vehicle

- 12 -

revealed a large bag of methamphetamine.  *Id.*  The Supreme Court considered "whether police may routinely extend an otherwise-completed traffic stop, absent reasonable suspicion . . . ." 575 U.S. at 353.  The Court held that a police officer's authority for a seizure . . . . ends when tasks tied to the traffic infraction are—or reasonably should have been completed." *Id.* at 354–57.

Here, the officers initially pulled Plaintiff over for a traffic infraction.  Officer Tucker confirmed the validity of Plaintiff's license, registration, and insurance before issuing a warning citation and returning it to Plaintiff along with his documents.  As in *Rodriguez,* the officers contend that the traffic stop had not ended after the citation was in Plaintiff's possession.  Likewise, here the officers asked Plaintiff if he would voluntarily consent to a search of his vehicle, which Plaintiff declined.  (Mackenzie BWC, Dkt. 72-10 at 08:45–09:44.)  Last, the officers here continued to investigate Plaintiff after he denied the officers consent to search his vehicle.  (*Id.*)  As in *Rodriguez,* the officers' authority for a seizure ended when the tasks tied to the traffic infraction were completed.

Although the officers completed the traffic stop when Officer Tucker handed Plaintiff the citation, the officers were permitted to ask Plaintiff if he would voluntarily consent to a search of the car.  (Tucker BWC, Dkt. 72-9 at 08:49–09:36; Mackenzie BWC, Dkt. 72-10 at 09:23–09:31.)  *See United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) (explaining that without consent, an officer's decision to detain a motorist and search the vehicle is governed by the reasonable suspicion standard set forth in *Terry*); *Fair v. Mills*, 230 F. Supp. 3d 1305, 1311 (M.D. Fla. 2017) ("There is

considerable jurisprudence supporting the notion that consent may be voluntarily given when an individual is confronted by several armed law enforcement officers and even after an individual is placed in handcuffs.") (collecting cases).  Once Plaintiff refused consent, however, a reasonable juror could conclude the seizure by Officer Mackenzie became unlawful.  *See United States v. Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003) ("The police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search.").  After Plaintiff refused consent, Officer Mackenzie stated for the first time that Officer Tucker saw furtive movements before the stop began, and the officers told Plaintiff that they were permitted to search the immediate area of Plaintiff's furtive movements regardless of Plaintiff's refusal to consent. (Tucker BWC, Dkt. 72-9 at 09:25–09:45; Mackenzie BWC, Dkt. 72-10 at 09:10– 10:15.)  A reasonable juror could conclude this seizure was unlawful.  It would have been clear to any ordinary citizen that the citizen was not free to leave under the circumstances.  *See United States v. Perkins*, 348 F.3d 965, 969 ("A seizure takes place 'whenever a police officer accosts an individual and restrains [their] freedom to walk away.'" (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

The officers cite three cases to support their position that no unlawful seizure occurred.  (Dkt. 86 at 14–15; 88 at 17–18 (citing *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001); *United States v. Console*, 2022 U.S. Dist. LEXIS 104777, at *23 (S.D. Fla. Jan. 25, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 104293 (S.D. Fla. June 10, 2022); *United States v. Young*, No. 15-60328-CR, 2016 U.S. Dist. LEXIS 160977, at *3 (S.D. Fla. Nov. 8, 2016), *report and recommendation adopted*,

2016 U.S. Dist. LEXIS 161066 (S.D. Fla. Nov. 21, 2016)).)  These cases are inapposite as they involve instances in which officers did not prolong an active traffic stop.  The court discusses each case in turn.

In *United States v. Purcell*, an officer conducted a traffic stop pulling the defendant over for following too closely.  236 F.3d at 1276.  Once the officer received the occupants' identifications, the officer requested a routine criminal-history computer check on the occupants.  *Id*.  While waiting for that information, the officer asked the defendant if he had "any narcotics, weapons, firearms, contraband, anything like that in the car."  *Id*.  The defendant said no.  *Id*.  Soon after, the defendant consented to a search of the car.  *Id*.  As an issue of first impression, the Eleventh Circuit was asked to decide whether the officer unconstitutionally prolonged the stop to wait for information on the criminal histories of the vehicle's occupants.  *Id*.  The Eleventh Circuit held that concerns for officer safety justify a request for information regarding the criminal histories of a vehicle's occupants during a traffic stop.  *Id*. at 1277–78 ("The request for criminal histories as part of a routine computer check is justified for officer safety. It is both reasonable and minimally intrusive.")  The Eleventh Circuit reasoned that the officer in *Purcell* did not unreasonably prolong the traffic stop because the officer radioed for a criminal-history check before the citation was issued and three minutes before the defendant consented to a search of the car.  *Id*. at 1278–79 ("The total time consumed by the traffic stop, prior to the consent to the search, was fourteen minutes. This duration imposed no significant Fourth Amendment hardship.") (internal quotation omitted).

*Purcell* is distinguishable from the instant case.  Here, Plaintiff had already received a citation when the officers asked to search the car and unlike the defendant in *Purcell*, Plaintiff did not consent to a search of his vehicle.  (Tucker BWC, Dkt. 72-9 at 08:47–09:28.) To the extent the officers assert that Plaintiff voluntarily consented to the search, the videos from the body-worn cameras do not support that assertion.[2] (Dkt. 88 at 3 ("Initially, . . . Plaintiff gave consent to search and stepped out of his vehicle, and told the [o]fficers[,] he would let them see 'where he was at' and that they could 'search [his] pockets' because 'he don't have nothing on [him].'").)  Even if Plaintiff voluntarily consented to the search, which the court does not find, the officers concede that Plaintiff revoked his voluntary consent.  (*Id.* ("The [o]fficers asked . . . Plaintiff to stand by their vehicle for safety reasons while they conducted the search. . . . Plaintiff refused . . . . Plaintiff would have allowed the search if he could have stood close by to watch the search."); *see also* Mackenzie BWC, Dkt. 72-10 at 09:44–11:04.) *See Florida v. Jimeno*, 500 U.S. 248, 252 (1991) (holding that a person's consent to be subjected to a search operates only as far as the scope of the consent given); *Fair*, 230 F. Supp. at 1310 ("It is well-recognized that an individual who has consented to have a police officer search his person or possessions may later restrict the scope of consent given, including revoking consent entirely.") (collecting cases).  Indeed, the Supreme Court has held that if a consent to search "is the product of an unlawful detention, 'the

---

[2] A review of the footage from the officers' body-worn cameras shows that Plaintiff stated that he would let the officers see "where he was at" after he denied the officers his consent to search the vehicle and after the officers made it clear to Plaintiff that they were going to search the car.  (Tucker BWC, Dkt. 72-9 at 08:40–10:15.)

consent was tainted by the illegality and was ineffective to justify the search.'" *Ohio v. Robinette*, 519 U.S. 33, 51 (1996) (quoting *Florida v. Royer*, 460 U.S. 491, 507–08 (1983)); *Perkins*, 348 F.3d at 971.

In *United States v. Console*, an officer observed a vehicle speeding and making an improper left turn from his rear-view mirror.  2022 U.S. Dist. LEXIS 104777, at *6.  Upon approaching, before the officer said anything, he noticed the passenger defendant with hands up in the air.  *Id.*  The officer also noticed during the stop that the defendant appeared nervous, was reluctant to speak with the officers, checking his waistband potentially for a weapon, and the defendant was wearing an ankle monitor potentially from court-ordered supervision.  *Id.* at *8–9.  Based on these circumstances, the officer removed the defendant from the car, frisked the defendant, felt a firearm, and alerted another officer who seized the firearm.  *Id.*

The court denied the defendant's motion to suppress concluding that the evidence did not support a finding that the officers prolonged the stop to conduct an unrelated investigation because it took approximately seven minutes from when the stop began to when the officers put the defendant in the back seat of the police car.  *Id.* at *23. ("Although there is no bright-line rule concerning the reasonable duration of a traffic stop, seven minutes surely is not an unreasonable length of time for officers to complete the mission of a traffic stop.") Since officers are allowed to remove passengers and check for weapons for their safety during a traffic stop, the court further reasoned that pulling the passenger defendant out of the car to pat him down was part of the traffic stop.  *Id.* at *22–24 ("Because Defendant was removed from the car during

the traffic stop, the officers could lawfully remove Defendant for their safety. Indeed, the court has consistently held that [d]uring a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety . . . including requiring the driver and passengers to exit the vehicle as a matter of course.") (citing *United States v. Gibbs*, 917 F.3d 1289, 1295) (internal quotation omitted). The court emphasized that the case was "simply not a case where the stop was over, and the police were prolonging the stop in order to gather more evidence to support their investigation." *Id*. at *24.

Unlike in *Console*, in this case, the stop ended when Officer Tucker handed Plaintiff a citation and returned his documents. A reasonable jury could conclude that the officers prolonged the completed stop to gather evidence to support a drug investigation. A review of the footage from the officers' body-worn cameras indicates that before the seizure, Plaintiff did not immediately put his hands up when approached by the officers, but instead was cooperative. At the time Officer Tucker checked his information, Plaintiff did not resist any officer commands and Plaintiff was not wearing an ankle monitor. (Mackenzie BWC, Dkt. 72-10 at 01:58–8:50.) Additionally, the officers did not remove Plaintiff from the vehicle during the traffic stop even after Officer Mackenzie observed a knife in plain view. (Mackenzie BWC, Dkt. 72-10 at 01:26–01:35.) After Plaintiff denied the officers his voluntary consent to search the vehicle and Officer Mackenzie informed Plaintiff that they would search the vehicle, Plaintiff explained to the officers that he did not possess anything. (Tucker BWC, Dkt. 72-9 at 10:00–10:20, Mackenzie BWC, Dkt. 72-10 at 09:55–10:25.) The

officers disregarded Plaintiff's responses and insisted that he step behind the vehicle so they could perform a search. (Tucker BWC, Dkt. 72-9 at 10:21–10:30.) Thus, this case is factually distinguishable from *Console*.

In *United States v. Young*, the court found the duration of a traffic stop was reasonable where an officer in the process of writing three traffic citations (1) questioned the defendant about why his driver's license and registration listed two different addresses, (2) questioned the defendant about his criminal background, and (3) ran a driver's license check before calling a K-9 unit to the scene after the defendant refused a search of the car. 2016 U.S. Dist. LEXIS 160977, at *3. Once the K-9 unit arrived, the K-9 officer immediately alerted to the presence of drugs in the trunk, and a search of the trunk resulted in a seizure of cocaine. *Id*. at *4. The court denied the defendant's motion to suppress because the police officer did not unreasonably prolong the traffic stop when the officer inquired about the defendant's address and criminal history while writing the traffic citations. *Id*. at *8–9 (explaining that it "took [the officer] approximately 15 minutes [to question the defendant and for the K-9 officer to arrive,] which is clearly a reasonable amount of time for [the officer] to inquire on these issues . . . [u]nder these facts, [d]efendant was detained for the amount of time reasonably required to complete the mission of issuing the tickets for the traffic violations, and the duration of the stop was therefore reasonable.")

Here, unlike in *Young*, Officer Tucker handed Plaintiff a warning citation and returned his documents before asking if he could search the vehicle. (Tucker BWC, Dkt. 72-9 at 08:26–09:06.) The *Young* court recognized that an officer's authority to

seize a motorist during a traffic stop is complete once the officer issues a citation and returns the motorist's documents.  *Young*, 2016 U.S. Dist. LEXIS 160977, at *9 ("Defendant's reliance on *Rodriguez* is misplaced.  In that case, the police continued to detain the defendant despite having fully completed the traffic stop, including returning all documents and writing all citations . . . . Under those circumstances, the justification for the stop was complete[,] and the police, having no independent basis for the detention[,] should not have detained the defendant further.  Here, by contrast, [the officer] was still in the process of writing traffic citations when the K-9 unit arrived.")

Officer Mackenzie testified that he subjectively believed that the traffic stop had not ended because Officer Tucker had not yet told Plaintiff that he was free to leave. (Mackenzie Dep., Dkt. 72-5 at 41:19–43:11.)  Viewing the facts in the light most favorable to the Plaintiff and considering them from an objectively reasonable officer's perspective, the court finds that a reasonable jury could conclude that a reasonable officer would know that his authority to seize Plaintiff terminated after confirming the validity of Plaintiff's driver's license and registration, confirming that Plaintiff did not have any active or outstanding warrants, and handing him back his documents with a printed warning citation.  (Tucker BWC, Dkt. 72-9 at 00:28–08:50.)

The court now examines whether, for qualified-immunity purposes, the officers had an articulable reasonable suspicion to conduct an additional investigatory stop for suspected drug activity.

### b) Investigatory Stop

"[L]aw enforcement officers may seize a suspect for a brief, investigatory stop . . . where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20.  After a police officer completes a traffic stop investigation, an officer may conduct an additional investigatory stop if the officer has "articulable suspicion of other illegal activity."  *Tapia*, 912 F.2d at 1370.  An officer's reasonable suspicion must be based upon specific articulable facts and the rational inferences that flow from them.  *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009).  Accordingly, an officer must be able to articulate something more than an "inchoate and unparticularized suspicion or hunch."  *Terry*, 392 U.S. at 27.  In evaluating the validity of a stop, a court must consider the totality of the circumstances.  *See United States v. Cortez*, 449 U.S. 411, 417 (1981).  The "investigative stop contemplated by *Terry* is not a policing tool that can be constitutionally deployed in any context in which law enforcement has reasonable suspicion that an individual is involved in criminal activity." *United States v. Valerio*, 718 F.3d 1321, 1324 (11th Cir. 2013).  That is, an investigative stop to investigate criminal activity may be used "only within the 'rubric of police conduct' addressed in *Terry*, for which the timing and circumstances surrounding the investigative stop matter."  *Id*. (quoting *Terry*, 392 U.S. at 20). The rubric of police conduct as contemplated in *Terry* includes conduct that

requires an officer to take 'necessarily swift action predicated upon the on-the-spot observations of the officer on the beat–which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.' *Id*. ("*Terry* stops are thus limited to situations where officers are required swift action predicated upon the on-the-spot observations of the officer on the beat.")

The officers contend that the traffic stop was not completed and maintain they had reasonable suspicion to conduct their investigation.  The officers assert that they had reasonable suspicion to investigate Plaintiff "for connection to drug activity" because during the traffic stop: (1) Plaintiff admitted that he had just left the nearby apartment complex where the caller had reported a suspicious vehicle, (2) Plaintiff further admitted to serving time in prison for drug-related crimes, (3) Officer Mackenzie observed a knife in plain view, (4) Plaintiff was avoiding eye contact and target glancing, and (5) after Plaintiff received the citation, Officer Mackenzie informed Plaintiff that Officer Tucker saw furtive movements before the traffic stop began.  (Dkt. 88 at 17.)

Plaintiff argues that the officers did not have reasonable suspicion to conduct an additional investigatory stop for drug activity based on the pre-traffic stop call for a suspicious vehicle because the officers did not corroborate the information provided by the anonymous caller.  According to Plaintiff, information provided by an anonymous caller provides the basis for reasonable suspicion to conduct an investigatory stop only when it is sufficiently corroborated by law enforcement because the basis of the tipster's knowledge and veracity of the information given is generally

unknown.  (Dkt. 101 at 8.)  As for the furtive movements observed by Officer Tucker, Plaintiff disputes the credibility of Officer Tucker's assertion. (Dkt. 72 at 3.)  However, even if Officer Tucker did see furtive movements before the traffic stop began, Plaintiff maintains that the movements are inapposite to determining whether the officers objectively had reasonable suspicion to conduct an additional investigative stop for drug activity because the officers did not ask Plaintiff to step out of the vehicle as soon as the traffic stop began or closest in time to when Officer Tucker observed the furtive movements. (Dkt. 101 at 8–9.)  Regarding Plaintiff's target glancing and avoiding eye contact, Plaintiff argues that the video evidence from the officers' body-worn cameras disputes these assertions.  (*Id.* at 8–9.)  Even if Plaintiff was avoiding eye contact, he asserts that this alone is not enough for the officers to have reasonable suspicion he was involved in drug activity because any perceived nervousness stemmed from him being momentarily detained by an authority figure with police power over him.  (*Id.* at 9.)

The officers do not cite any legal authority to support their contention concerning reasonable suspicion.  (*See generally* Dkt. 88 at 15–18, 86 at 13–14.)  The court is not obligated to develop the officers' argument and declines to do so here.  *See United States Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (declining to address an argument because it was perfunctory, underdeveloped, and not supported by citation to authority); *Resol. Trust Corp. v. Dunmar*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it.").  The court's

analysis does not end here, however, because for qualified-immunity purposes, the court must still evaluate whether, based on the totality of the circumstances, objectively reasonable officers would believe they had reasonable articulable suspicion to detain Plaintiff further to investigate drug activity.  Additionally, Plaintiff moves for summary judgment as a matter of law as to this count.  (Dkt. 72 at 17.)

Viewing the facts in the light most favorable to Plaintiff, the court concludes based on the totality of circumstances that for qualified-immunity purposes, objectively reasonable officers would not believe they had reasonable suspicion to detain Plaintiff further after the traffic stop.  In response to the officers' argument that they had reasonable suspicion based on the call for service, Plaintiff cites *McKelvin v. State*, 53 So. 3d 401, 404 (Fla. Dist. Ct. App. 2011), and *Baptiste v. State*, 995 So. 2d 285, 292 (Fla. 2008), to make two interrelated points.  First, the officers did not have reasonable suspicion to conduct an additional investigatory stop because the officers did not independently corroborate the information from the pre-traffic stop call.  (Dkt. 101 at 8.)  Second, information provided by an anonymous tipster only provides the basis for reasonable suspicion to conduct an investigatory stop when it is sufficiently corroborated by law enforcement because the basis of the tipster's knowledge and veracity of the information given is generally unknown.  (*Id.*)

The court agrees with Plaintiff's contentions that the officers cannot rely on the uncorroborated, anonymous tip to articulate reasonable suspicion.  *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (explaining that a tip received from an unknown caller in an unknown location "seldom demonstrates the informant's basis of knowledge or

- 24 -

veracity" versus a tip from a known informant whose reputation can be assessed and who can be held responsible if the allegations turn out to be fabricated (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990))); *White*, 496 U.S. 325, 329 (1990) ("Some tips, completely lacking in indica of reliability, would either warrant no police response or require further  investigation before a forcible stop of a suspect would be authorized . . . . [An anonymous] tip . . . standing alone[] would not warrant a man of reasonable caution in the belief that [a stop] was appropriate." (citation and quotation omitted)); *Baptiste v. State*, 995 So. 2d 285, 296–97 (Fla. 2000) (holding, based on *Florida v. J.L.*, that an anonymous 9-1-1 telephone call stating that a black man wearing a white T-shirt and blue denim shorts waved a firearm in front of a supermarket did not provide officers with the reasonable suspicion necessary to initiate an investigative stop of the defendant, who matched the description, because the defendant's attire was too generic, the tip was anonymous, the caller did not provide any inside knowledge about the defendant, the caller did not provide predictive information that corroborated the tipster's claim that the defendant was engaged in illegal conduct, and when the officers arrived, they did not witness the defendant engage in any unlawful acts, unusual conduct, or suspicious behavior); *McKelvin v. State*, 53 So.3d 401, 403–05 (Fla. Dist. Ct. App. 2011) (holding that two police officers could not rely on an anonymous tip from a random person who approached them while they were on an unrelated stop and told them that a black man in a burgundy or red Dodge Charger with 23 or 24-inch chrome rims was engaged in "narcotics activity" because there was no record evidence that the police officers had knowledge or were concerned about drug-dealing

activity in the subject area, the officers did not have any contact information to locate the informant to corroborate the tip, the officers did not know the motive of the informant, there was no record evidence of whether the officers were able to discern the tipster's credibility during the encounter, and the officers admitted that they did not witness even a traffic infraction before initiating the stop of the plaintiff).

The officers cannot rely on the anonymous tip to articulate reasonable suspicion to conduct an additional investigatory stop of Plaintiff for drug activity for several reasons. First, based on the CAD report, the anonymous caller called in a suspicious vehicle, and the dispatcher—not the anonymous caller—indicated to the officers that the incident could be related to narcotics. (Dkt. 85-6 at 1; *see also* Tucker Dep., Dkt. 72-3 at 9:2–6 ("Q. So[,] the initial call is for a suspicious vehicle that matched the description of this guy's vehicle. A. Correct.").) The officers cannot rely upon the 9-1-1 call to establish articulable suspicion when the anonymous caller never mentions drug activity. Additionally, as Plaintiff notes, his clothing did not match the description given by the anonymous caller. (*Id.*) A review of the footage from the officers' body-worn cameras shows that Plaintiff was wearing a green T-shirt and khaki shorts, not a red tank top and black basketball shorts as the caller indicated to the dispatcher. (Tucker BWC, Dkt. 72-9 at 09:50–10:12, Dkt. 85-6 at 1.) The tip was not sufficiently reliable as to illegal activity. *See J.L.*, 529 U.S. at 271–72 (explaining that reasonable suspicion requires that a tip "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person"); *White*, 496 U.S. at 332 (explaining that an anonymous tip containing a range of details related not just to easily obtained

facts and conditions existing at the time of the tip but also to future actions of third parties that are ordinarily not easily predicted makes it reasonable for police to believe that the person providing the tip likely has access to reliable information about the alleged suspect's illegal activities); *see also Baptiste*, 995 So. 2d at 85 (holding that police officers who seized the plaintiff at gunpoint based solely on him matching the clothing description of an anonymous tip violated the Fourth Amendment because the confirmation of a physical description without the officers observing any suspicious conduct or developing an indication of suspicious behavior through investigation is not enough to articulate reasonable suspicion).  Here, the anonymous caller reported seeing a suspicious vehicle.  The caller did not assert that they had knowledge of concealed criminal activity or that they had observed criminal activity.  Next, Officer Tucker admitted that the officers did not independently investigate or follow up on the initial tip to sufficiently corroborate it before or after the traffic stop, and the officers never spoke to the anonymous tipster to weigh the tipster's credibility.  (Tucker Dep., Dkt. 72-3 at 9:2–9:21.)  *See J.L.*, 529 U.S. 266, 269–73; *White*, 496 U.S. at 332 ("When significant aspects of [an anonymous] caller's predictions of the suspect's movements were verified [through independent police investigation], there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop."); *McKelvin v. State*, 53 So.3d at 403–05.  Further, the officers do not argue that they observed Plaintiff engaged in narcotics activity or that they had prior dealings with Plaintiff involving narcotics activity.  And the officers do not argue that they were concerned about drug activity in the area.  *See id.*

- 27 -

Based on a totality of circumstances, and taking the facts in the light most favorable to Plaintiff, the court concludes that the officers could not rely on the anonymous tip to articulate reasonable suspicion to conduct an additional investigatory stop of Plaintiff when (1) the anonymous tipster did not relay seeing Plaintiff engaged in narcotics activity, (2) Plaintiff did not match the clothing description of the person described by the anonymous tipster, (3) the tip did not indicate that the anonymous tipster had specific knowledge of concealed criminal activity, (4) the officers concede that they did not independently investigate the tip and did not speak to the anonymous tipster to weigh the tipster's credibility, (5) the officers did not observe Plaintiff engaging in narcotics activity prior to the traffic stop and did not have prior dealings with Plaintiff to form an independent basis of knowledge of Plaintiff's involvement in narcotics activity, and (6) there is no record evidence that the officers were concerned about drug activity in the area.

Next, the court addresses Officer Tucker's observation of furtive movements. The court finds that a genuine dispute of material fact exists concerning whether Officer Tucker observed Plaintiff making furtive movements.   Officer Mackenzie testified that he had not observed any furtive movements before the traffic stop. (Mackenzie Dep., Dkt. 72-5 at 127:10–127:13.)  Further, a review of the body-worn camera footage shows that Plaintiff's car windows, including the back window, contain heavy tint.  (Tucker BWC, Dkt. 72-9 at 00:30–00:35; Mackenzie BWC, Dkt. 72-10 at 00:32–00:40.)   Officer Mackenzie further testified that he could not see through Plaintiff's rear window even when he used a flashlight.  (Dkt. 72-4 at 6:20–

7:16.)  Even if Officer Tucker did see furtive movements before the traffic stop began, Plaintiff argues that a reasonable juror could find that the furtive movements are inapposite to determining whether the officers objectively had reasonable suspicion to conduct an additional investigative stop for drug activity because the officers did not ask Plaintiff to step out of the vehicle as soon as the traffic stop began or closest in time to when Officer Tucker observed the furtive movements. (Dkt. 101 at 8–9.)  The court agrees with Plaintiff.  A genuine dispute of material fact also remains concerning whether Plaintiff was targeting glancing and avoiding eye contact.  Plaintiff argues that the video evidence disputes these assertions.  (*Id.* at 9.)  Upon review of the video footage of the incident, the court finds that a reasonable juror could conclude that Plaintiff was not avoiding eye contact and instead was cooperative in answering Officer Mackenzie's questions during the traffic stop.  (Mackenzie BWC, Dkt. 72-10 at 01:55–08:57.)  Even if Plaintiff was avoiding eye contact, he argues that this alone is not enough for the Officers to have reasonable suspicion he was involved in drug activity because any perceived nervousness stemmed from him being momentarily detained by an authority figure with police power over him.  (Dkt. 101 at 9–10.)

Conversely, there is no dispute that during the traffic stop (1) Plaintiff confirmed that he had just left the apartment complex where the suspicious vehicle was reported, (Dkt. 72 at 2), (2) Plaintiff told Officer Mackenzie that he had spent nineteen years in total in prison for drug-related crimes, (Mackenzie BWC, Dkt. 72-10 at 02:45–03:32), and (3) Plaintiff had a knife in plain view for which he did not reach, (*id.* at 01:26–01:35).  Thus, taking the facts in the light most favorable to the officers, the court

cannot say as a matter of law that the officers did not have articulable reasonable suspicion to conduct an additional investigatory stop of Plaintiff for drug activity. *See Grider*, 618 F.3d at 1254. Accordingly, genuine issues of material fact remain concerning whether (1) Officer Tucker observed furtive movements, (2) whether the officers could reasonably rely on these furtive movements in conjunction with the other facts to articulate reasonable suspicion for the additional investigatory stop when Plaintiff was allowed to remain in his vehicle until he denied voluntary consent to search his car, (3) whether Plaintiff was target glancing or avoiding eye contact suspiciously, and (4) whether the fact that Plaintiff had just left the complex where the suspicious vehicle was reported, plus the furtive movements, target glancing, a knife in plain view, and Plaintiff's voluntary information about his past drug-related criminal history gave the officers articulable reasonable suspicion to support the additional investigatory stop after the they completed the traffic stop. These issues remain for trial.

### 2. Clearly Established Right

The court now considers whether the officers' conduct violated a clearly established right. *See id.* "[T]he dispositive question is whether the law at the time of the challenged conduct gave the government official fair warning that his conduct was unconstitutional." *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021). "A right may be clearly established in one of three ways: (1) 'case law with indistinguishable facts clearly establishing the constitutional right'; (2) 'a broad statement of principle within the Constitution, statute, or case law that clearly

establishes a constitutional right'; or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Baxter*, 54 F.4th at 1263 (citing *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)).

The first method requires the court to look at relevant caselaw at the time of the alleged events and determine whether "a concrete factual context [existed] . . . to make it obvious to a reasonable government actor that his actions violate federal law." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") Likewise, the dispositive question is "whether the violative nature of particular conduct is clearly established." *Ashcroft*, 563 U.S. at 742. Thus, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 (2004) (quotation and citation omitted). The second and third methods are known as "obvious clarity" cases. *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017). Obvious clarity cases exist when the "constitutional provision at issue [is] so clear and the conduct [is] so bad that case law is not needed to establish that the conduct cannot be lawful" or where existing case law is "so clear and broad (and not tied to particularized facts) that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *King v. Pridmore*, 961 F.3d 1135, 1146 (11th Cir. 2020). The Eleventh Circuit has clarified that obvious clarity cases are a "narrow exception," and cases that fall within this exception "are

rare and [do not] arise often." *Id.* Thus, if a plaintiff cannot successfully show the law at issue was clearly established under the first method, ordinarily qualified immunity is appropriate. *See Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) ("[A] plaintiff's citation of general rules or abstract rights is insufficient to strip a [Section] 1983 defendant of his qualified immunity.").

Here, the Supreme Court has clearly established that absent reasonable suspicion, police officers cannot prolong a stop based on a traffic infraction to investigate other crimes not related to the traffic infraction. *Rodriguez*, 575 U.S. at 357. A reasonable objective officer had sufficient notice that their conduct in prolonging the traffic stop to conduct a drug investigation was unlawful under the circumstances here. *See Rodriguez*, 575 U.S. at 354 (explaining that an officer's "authority for [a traffic stop] seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed"); *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004) ("Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled and other documents should be returned.").

Additionally, *Florida v. J.L.*, 529 U.S. 266 (2000), clearly establishes that an anonymous tip lacking sufficient indica of reliability cannot be used to articulate reasonable suspicion to justify a *Terry* investigatory stop.  In *Florida v. J.L.*, an anonymous 9-1-1 caller reported that a young black male was standing at a specific bus stop wearing a plaid shirt and was carrying a gun. *J.L.*, 529 U.S at 268.  The record did not contain an audio recording of the tip, and the officers knew nothing about the

informant.  *Id.* Sometime after, two police officers were dispatched and arrived at the

bus stop and saw three black males.  *Id.* One of the males, the defendant, was wearing

a plaid shirt.  *Id.*  Aside from the tip, the officers had no basis to suspect the defendant

and the two other individuals of engaging in illegal conduct.  Further, the officers did

not see the defendant with a firearm, and the defendant did not make any threatening

or otherwise unusual movements.  *Id.*  One of the officers approached the defendant

and advised him to put his hands up while the officer frisked him.  The officer seized

a gun from the defendant's pocket.  *Id.*  The defendant was charged with carrying a

concealed firearm without a license and possessing a firearm as a minor.

Affirming the Florida Supreme Court's ruling finding the search was invalid

under the Fourth Amendment, the Supreme Court held that the officers could not rely

on the anonymous tip that they received to articulate reasonable suspicion to justify

the *Terry* frisk of the defendant because the tip did not contain "sufficient indicia of

reliability to provide reasonable suspicion to make the investigatory stop." *Id.* at 271–

273.  The Court reasoned that the tip lacked sufficient indicia of reliability because the

caller did not provide any predictive information of the defendant's future movements,

which would indicate reliability because the tipster had inside knowledge of the

suspect's affairs and would also give the police the ability through investigation to test

the tipster's knowledge and credibility.  *Id.* (comparing the tip in this case to the tip

received in *Alabama v. White*, in which the police received an anonymous tip asserting

that a woman was carrying cocaine and the tipster predicted[:] "that she would leave

an apartment building at a specified time, get into a car matching a particular

description, and drive to a named motel . . . . [s]tanding alone, the tip would not have justified a *Terry* stop. . . . . Only after police observation showed that the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine.").  The Court further reasoned that the fact that the defendant was actually wearing a plaid shirt at the specified bus stop is irrelevant in determining whether the tip had sufficient indicia of reliability because the tip must be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.  *Id.* at 272.

Likewise, here the 9-1-1 call did not support a finding of articulable suspicion to support a *Terry* stop.  First, there is no evidence in the record that the caller observed in illegal narcotics activity as they instead reported a suspicious vehicle.  (Dkt. 85-6.)  Second, Plaintiff did not match the clothing description of the individual the caller described to the dispatcher.  Indeed, the 9-1-1 call received in this case is similar to the tip that was received in *J.L.*  First, like the tip in *J.L.*, the caller here did not have any predictive information or insider knowledge about the individual he described to the dispatcher.  Second, the officers did not follow up with the caller to weigh their credibility.  Last, there is no evidence contained in the record that supports the tip was reliable in its assertion of illegality at the time the stop occurred.  For these reasons, viewing the facts in the light most favorable to Plaintiff, the court finds that a reasonable objective officer had notice that they could not rely on an anonymous tip

to articulate reasonable suspicion for an investigatory stop for narcotics activity under the circumstances presented in this case.

Therefore, the court finds that the officers are not entitled to qualified immunity for Count 5 of Plaintiff's Complaint because the right to be free from unlawful seizure in the manner the officers' allegedly seized Plaintiff was clearly established before the seizure of Plaintiff occurred.

### B. False Arrest – Officers (Counts 1, 3)

Plaintiff moves for summary judgment on his false arrest claims brought against the officers pursuant to state law (Count 1) and 42 U.S.C. § 1983 (Count 3). (Dkt. 72 at 1, 6–12.) The officers also move for summary judgment and immunity as to these counts. (Dkt. 88 at 1, 15–18.)

To succeed on a federal false arrest claim, a plaintiff must establish a lack of probable cause and an arrest. *See Crocker v. Beatty*, 995 F.3d 1232, 1245 (11th Cir. 2021). When a police officer has probable cause to make an arrest, a false arrest claim fails. *Id*. Thus, as long as a police officer has probable cause to arrest an individual, for any crime, a false arrest claim cannot be sustained against the officer. *See Atwater v. City of Largo Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). The same is true for a false arrest claim brought under Florida law. *See Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) ("[P]robable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest . . . . [and] the standard for determining whether

probable cause exists is the same under Florida and federal law.") (collecting cases). "[P]robable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 898–99 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 538 U.S. 48, 57 (2018)).  Courts look to the elements of the alleged crime and the facts presented to determine whether an officer had probable cause.  *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010).  However, a police officer is entitled to qualified immunity even if they had "arguable probable cause" to arrest an individual.  *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998).  Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed to arrest" the plaintiff. *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990). "Arguable probable cause does not require an arresting officer to prove every element of a crime . . . before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1303 (11th Cir. 2001).

Plaintiff argues that if the court determines Plaintiff was arrested prior to Plaintiff attempting to leave the investigatory stop, then probable cause did not exist to arrest Plaintiff because the officers did not communicate an intention to effect an arrest prior to Plaintiff driving away.  (Dkt. 72 at 10 (citing *Melton v. State*, 75 So. 2d 291, 294 (Fla. 1954) and *Elliot v. State*, 704 So. 2d 606, 610 (Fla. Dist. Ct. App. 1997))).

Alternatively, Plaintiff argues that if the court determines that the arrest occurred when Plaintiff was handcuffed after the crash, then Plaintiff's arrest was without probable cause for aggravated battery on a law enforcement officer because Plaintiff did not intend to touch or strike the officers with his vehicle.  (*Id*. at 11–12.)  Plaintiff further argues that the officers lacked probable cause because they were not engaged in the lawful performance of their duties when they attempted to remove Plaintiff from his vehicle, which is a required element of aggravated battery on a law enforcement officer.  (*Id*. at 12.)  The officers argue that they are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff for resisting an officer with violence after he drove away.  (Dkt. 88 at 9–13.)

Under Florida law, a battery on a law enforcement officer occurs when an individual: (1) knowingly (2) actually (3) intentionally (4) touches or strikes (5) a law enforcement officer (6) against the officer's will (7) while the officer was engaged in the lawful performance of his duties.  *Miller v. State*, 636 So. 2d 144, 150 (Fla. Dist. Ct. App. 1994); *see also State v. Henriquez*, 485 So. 2d 414, 415 (Fla. 1986).  A battery becomes an aggravated battery under Florida law when a deadly weapon is used.  Fla. Stat. § 784.045(2).  An object is considered a deadly weapon under Florida law if it "will likely cause death or great bodily harm when used in the ordinary and usual manner contemplated by its design."  *Humphreys v. State*, 299 So. 3d 576, 578 (Fla. Dist. Ct. App. 2020) (quoting *Brown v. State*, 86 So. 3d 569, 571 (Fla. Dist. Ct. App. 2012)).

The court finds that Plaintiff was not arrested until he was handcuffed after he drove away in his vehicle.  Viewing the facts in the light most favorable to the Plaintiff, his unlawful seizure turned into a lawful arrest once Plaintiff intentionally and knowingly drove away with the officers hanging from his moving vehicle.[3]  Plaintiff testified that he was aware that the officers were hanging onto him when he put his vehicle in drive and began driving off.  (Jarvis Dep., Dkt. 85-2 at 169:4–17.)  Plaintiff's vehicle was potentially used as a deadly weapon at that point because use in its ordinary, usual  manner could have caused death or great bodily harm to the officers.  *Humphreys*, 299 So. 3d at 578.  Therefore, virtually every element of aggravated battery on a law enforcement officer had been met by the time Plaintiff was handcuffed.  However, as previously mentioned, the officers were not required to prove every element of a crime before arresting Plaintiff.  *Scarbrough*, 245 F.3d 1299 (11th Cir. 2001); *see also Miller*, 636 So. 2d at 151 (citing *Read v. State*, 606 So. 2d 1246 (Fla. Dist. Ct. App. 1992) (explaining that engaging in a scuffle with an officer during an improper detention constitutes battery upon a law enforcement officer that can itself give rise to a valid arrest and conviction for the offense of resisting arrest with violence)).  Further, based on the totality of circumstances, a reasonable officer would have concluded that they had probable cause to arrest Plaintiff if he nearly ran them over with his vehicle.  The officers are also entitled to sovereign immunity as to Count

---

[3] Plaintiff does not dispute that he retreated to his vehicle, nor that the officers tried to grab him and pull him out of the vehicle.  (Dkt. 72 at 4.)  Plaintiff also does not dispute that before the officers could pull Plaintiff out of the vehicle, he drove off causing Officer Mackenzie to fall to the ground as Officer Tucker hung on to Plaintiff's moving vehicle.  (*Id.*)

1 because Plaintiff does not argue nor provide any authority supporting the contention that the officers acted in bad faith, with a malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property as to this count. *See* Fla. Stat. § 768.28(9)(a); (*See also generally* Dkt. 72 at 6–12, 101 at 3–5.)

Accordingly, the court concludes that the officers are entitled to sovereign immunity as to Count 1 and qualified immunity as to Count 3 because the officers had arguable probable cause to arrest Plaintiff for aggravated battery on a law enforcement officer. Plaintiff's motion is denied as to Counts 1 and 3 and the officers' motion is granted as to these counts.

### C. Excessive Force – Officers (Count 10)

Plaintiff moves for summary judgment on his excessive force claim (Count 10) brought against the officers pursuant to 42 U.S.C. § 1983. (Dkt. 72 at 1, 21–22.) The officers also move for summary judgment and qualified immunity as to this count. (Dkt. 88 at 1, 15–18.)

In the context of an arrest, excessive force claims are judged under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395–96 (1989). The court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the government's justification for using force and consider (1) the severity of the crime, (2) whether the suspect poses an immediate threat, and (3) whether the suspect is resisting arrest or attempting to evade arrest. *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The court also must consider the justification for using force, the relationship between the

justification and the force used, and the extent of any injury inflicted. *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014). However, the court "must be careful not to Monday-morning quarterback," [but must rather] judge '[t]he "reasonableness" of a particular use of force . . . from the perspective of a reasonable officer on the scene.'" *Patel v. City of Madison, Alabama*, 959 F.3d 1330, 1339 (11th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). Finally, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

Plaintiff argues he sustained unidentified injuries when the officers tried to grab him from his vehicle. (Dkt. 72 at 23.) Plaintiff further argues that he sustained other unidentified injuries when Officer Tucker forcibly handcuffed him after his vehicle crashed into an embankment. (*Id.*) Plaintiff also claims to have lost consciousness after the vehicle crashed and suffered back pain due to the officers' alleged excessive force. (Dkt. 1-1 ¶¶ 30, 124.) The officers argue any force was reasonable under the circumstances, considering their testimony that Plaintiff drove off with the officers holding on to the vehicle. (Dkt. 88 at 23.)

Viewing the facts in the light most favorable to Plaintiff, and without Plaintiff presenting any evidence establishing the severity of his injuries, the court finds that any force used by the officers in trying to remove Plaintiff from his vehicle was de minimis. *Nolin*, 207 F.3d at 1257–58 (concluding that only de minimis force was used when an officer grabbed the plaintiff, shoved him a few feet against a vehicle, pushed his knee into the plaintiff's back, pushed plaintiff's head against the vehicle, searched

plaintiff' groin area in an uncomfortable manner and placed the plaintiff in handcuffs, resulting in minor bruising).  The court also finds that any force used by Officer Tucker in handcuffing Plaintiff was reasonable.  *See Id.*; *United States v. Smith*, 318 F. App'x 780, 793 (11th Cir. 2009) (citing *United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir. 1982) (explaining that even if an initial seizure or arrest was illegal, an individual's subsequent flight and assault of an officer constituted probable cause to arrest the individual)).  Further, even if Plaintiff was able to establish a constitutional violation—which he has not—Plaintiff does not cite any binding authority that supports that at the time of the incident it was clearly established that the amount of force employed by the officers violated the Constitution.  *Grider*, 618 F.3d at 1254.

For these reasons, the officers are entitled to qualified immunity as to Count 10 because any force used by the officers before Plaintiff drove away was de minimis and any force used after Plaintiff drove away with Officer Tucker hanging on to his vehicle was reasonable considering the circumstances.  Accordingly, Plaintiff's motion is denied as to Count 10, and the officers' motion is granted as to this count.

### D. Malicious Prosecution – Officers (Counts 11, 12)

Plaintiff moves for summary judgment on his malicious prosecution claims brought pursuant to state law (Count 12) and 42 U.S.C. § 1983 (Count 11) against the officers.  (Dkt. 72 at 1, 23–25.)  The officers also move for summary judgment and immunity as to these counts.  (Dkt. 88 at 1, 7–15.)

A claim of malicious prosecution requires a seizure pursuant to legal process. *See McDonough v. Smith*, 588 U.S. 109, 117 (2019) ("Looking first to the common law,

. . . malicious prosecution permits damages for confinement imposed pursuant to legal process.") (internal quotation marks omitted).   To establish a federal malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must prove a violation of their Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution. *Wood v. Kessler*, 323 F.3d 872, 881 (11th Cir. 2003).  The elements of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant, (2) with malice and without probable cause, (3) that terminated in the plaintiff accused's favor, and (4) caused damage to the plaintiff accused." *Id.* at 882.  Like a false arrest claim, a claim for malicious prosecution cannot defeat a qualified immunity defense if a police officer had arguable probable cause to arrest an individual for the offense charged.  *Grider*, 618 F.3d at 1256.  Unlike false arrest claims, however, malicious prosecution claims require that arguable probable cause or probable cause exists for each specific crime charged, not just any crime charged.  *See Chiaverni v. City of Napoleon, Ohio*, 602 U.S. 556, 563–64 (2024) (explaining that common law courts assessed probable cause charge-by-charge and thus, if one bad charge is joined with good ones, that is enough to satisfy the malicious prosecution  tort's "without probable cause element"); *see also Williams v. Aguirre*, 965 F.3d 1147, 1159–62 (11th Cir. 2020) (explaining that, based on common-law principles, the any-crime rule does not apply to malicious prosecution claims under the Fourth Amendment, reasoning that centuries of common law doctrine urge a charge-specific approach). To prove a malicious prosecution claim under Florida law, a plaintiff must prove six elements: "(1) [t]he commencement or

continuance of an original criminal or civil judicial proceeding.  (2) [i]ts legal causation by the present defendant against a plaintiff who was a defendant in the original proceeding[,]  (3) [i]ts bona fide termination in favor of the present plaintiff[,]  (4) [t]he absence of probable cause for such proceeding[,]  (5) [t]he presence of malice therein, (6) [and] [d]amage conforming to legal standards resulting to plaintiff." *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986).  "If any one of these elements is lacking, the result is fatal to the action." *Id.*

Here, Plaintiff has sufficiently established the first and third elements of his federal claim and the first and fourth elements of his Florida claim, because the court has already determined that the government terminated criminal proceedings brought against Plaintiff in Plaintiff's favor.  (*See* Dkt. 54 at 3–4.)  The court has likewise determined that the officers had arguable probable cause to arrest Plaintiff for aggravated battery on a law enforcement officer.  As such, the court will now turn to the parties' arguments concerning probable cause for the remaining charges in the charging affidavit.  *See Aguirre*, 965 F.3d at 1163–64.  Plaintiff was also charged with committing the following crimes: (1) aggravated fleeing/eluding law enforcement, (2) resisting an officer with violence, (3) possession of THC Oil, (4) possession of drug paraphernalia, (5) trafficking in a controlled substance (heroin), (6) unlicensed carrying of a concealed weapon, and (7) destroying/tampering with or fabricating physical evidence.  (Dkt. 85-5.)  To support their request for immunity as to both claims, the officers improperly argue that the any-crime rule applies and that they are entitled to immunity because they had arguable probable cause to arrest Plaintiff for resisting an

officer with violence, possession of a weapon, and committing a traffic violation.[4] (Dkt. 88 at 7–14.)  Plaintiff's argument regarding these claims is also deficient because Plaintiff conclusorily requests that the court determine that the officers did not have probable cause for each crime since Plaintiff was free to leave after receiving a warning citation.  Plaintiff has not analyzed why the officers lacked probable cause or arguable probable cause as to each specific charge as required.  The court declines to develop arguments for either party.  (*See* Dkt. 72 at 23–25.)  *See U.S. Steel Corp.*, 495 at 1287 n.13 (declining to address argument because it was perfunctory, underdeveloped, and not supported by citation to authority); *Resol. Trust Corp.*, 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it.").

Additionally, Plaintiff does not argue the charging affidavit was deficient and does not provide the court with any binding authority establishing that at the time the charging affidavit was drafted, the law was clearly established that a deficiency Plaintiff identified in the charging affidavit violated the Fourth Amendment.  *See Butler v. Smith*, 85 F.4th 1102, 1112 (explaining that to survive a qualified immunity defense for a malicious prosecution claim a plaintiff must establish a deficiency in the affidavit that violated the Fourth Amendment and such violation was clearly established at the time the affidavit was written); *see also Luke v. Gulley*, 50 F.4th 90, 97 (11th Cir. 2022)

---

[4] Although the Supreme Court did not decide that the any-crime rule does not apply to malicious prosecution until 2024 in *Chiaverni*, the Eleventh Circuit reached the same conclusion for materially similar, if not the same, reasons in *Aguirre*, a binding decision handed down  months before Plaintiff's arrest.  *See Aguirre*, 965 F.3d at 1162.

(explaining a conclusory affidavit is insufficient to support probable cause); *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019) (explaining that intentionally or recklessly omitting material information from an affidavit violates the Fourth Amendment in a malicious prosecution case).  Thus, the officers are entitled to qualified immunity as to Count 11 because Plaintiff has not carried his burden in demonstrating the officers violated a clearly established right as to this count.  Since neither party has met their burdens as to Plaintiff's state law malicious prosecution claim, both Plaintiff's and the officers' motions are due to be denied.   Accordingly, Plaintiff's and the officers' motions are denied as to Count 12, and the officers' motion is granted as to Count 11.

### E. Invasion of Privacy – Officers (Counts 7, 9)

Plaintiff moves for summary judgment on his invasion of privacy claims brought pursuant to state law (Count 7) and 42 U.S.C. § 1983 (Count 9) against the officers.  (Dkt. 72 at 1, 18–21.)  The officers also move for summary judgment and immunity as to these counts.  (Dkt. 88 at 1, 19–21.)

Although Plaintiff labels these counts as invasion of privacy claims, Plaintiff argues in his motion that the officers conducted an unlawful search of his vehicle in violation of the Fourth Amendment as to his federal claim.  (Dkt. 72 at 19–21.)  As to his state law claim, Plaintiff argues that the officers committed the tort of intrusion upon seclusion when they unlawfully searched his vehicle after his arrest.  (*Id*. at 20–21.) As to Plaintiff's federal claim, the officers argue that they were permitted to conduct an inventory search of his vehicle after Plaintiff was arrested.  (Dkt. 88 at 19.)

As to Plaintiff's state law claim, the officers argue they had probable cause to arrest Plaintiff and that, even if they did not, there is no evidence contained in the record that shows there was an intrusion by the officers that was highly offensive to a reasonable person as is required for this claim.  (*Id*. at 19–20.)

"Though the police generally need a warrant to conduct a search, they do not need a warrant to search an impounded car if they (1) had the authority to impound the car, and (2) followed department procedures governing inventory searches." *United States v. Isaac*, 987 F.3d 980, 988 (11th Cir. 2021); *see also United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991) (same).  Plaintiff does not challenge the inventory search conducted by the officers.  (*See generally* Dkt. 72 at 1, Dkt. 101 at 11–13.) Instead, Plaintiff challenges the lawfulness of his arrest, which the court has concluded was lawful for qualified immunity purposes as the officers had arguable probable cause to arrest Plaintiff for aggravated battery on a law enforcement officer.  Thus, absent any argument as to the legality of the inventory search, and because Plaintiff has failed to provide any binding authority that existed at the time the search was conducted that clearly established that the manner in which the officers conducted the inventory search of Plaintiff's vehicle violated the Fourth Amendment, the officers are entitled to qualified immunity as to Count 9.  *Grider*, 618 F.3d at 1254.  Accordingly, the officers' motion is granted as to Count 9, and Plaintiff's motion is denied as to Count 9.

The tort of intrusion upon seclusion consists of an (1) intentional intrusion (2) into another's solitude or seclusion, (3) which would be highly offensive to a

reasonable person.  *Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023); *see also Jackman v. Cebrink-Swartz*, 334 So. 3d 653, 656 (Fla. Dist. Ct. App. 2021).  The Florida Supreme Court has held that an act constituting an intrusion upon seclusion "must be of such nature as a reasonable man can see might and probably would cause mental distress and injury to anyone possessed of ordinary feelings and intelligence, situated in like circumstances as the complainant[.]" *Cason v. Baskin*, 155 Fla. 198, 215 (Fla. 1944).  An act will satisfy this standard if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Ponton v. Scarfone*, 468 So. 2d 1009, 1011 (Fla. Dist. Ct. App. 1985); *see also Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062 (Fla. Dist. Ct. App 1991) (the conduct alleged must be "atrocious, and utterly intolerable in a civilized community").  Based on the record and viewing the facts in the light most favorable to Plaintiff, the court finds that as a matter of law, the officers conducting an inventory search of Plaintiff's vehicle after he was arrested for nearly running the officers over with his vehicle is not an intrusion that goes beyond all bounds of decency. *Ponton*, 468 So. 2d 1009, 1011.  Accordingly, Plaintiff's motion is denied as to Count 7, and the officers' motion is granted as to this count.

### F. Conversion – Officers (Count 15)

The officers move for summary judgment on Plaintiff's state law conversion claim (Count 15).  Without citing any supporting authority, the officers assert that a claim for conversion is barred by sovereign immunity when the officers had probable cause to arrest Plaintiff.  (Dkt. 88 at 21.)  In response, without citing any supporting authority, Plaintiff relies on his arguments as to his other claims to establish a factual

basis in the record for his conversion claim.  (Dkt. 101 at 14–15.)  Absent any authority from either party and with only an undeveloped argument from the officers, the court declines to address the officers' argument as to this count.  *See U.S. Steel Corp.*, 495 at 1287 n.13 (declining to address argument because it was perfunctory, underdeveloped, and not supported by citation to authority).  Accordingly, the officers' motion is denied as to Count 15.

### G. Municipal Liability – City (Counts 1, 2, 4, 6, 8, 13, 14)

The City moves for summary judgment on Plaintiff's state law (Count 1) and 42 U.S.C. § 1983 (Count 2) false arrest claims, 42 U.S.C. § 1983 unlawful detention and search claim (Count 4), municipal liability claim (Count 6), and state law claims for invasion of privacy (Count 8), negligence (Count 13), and vicarious liability assault (Count 14) all brought against the City.[5]  (Dkt. 91 at 2–3.)

---

[5] The City also moved for summary judgment on the state law claims brought against the officers in their official capacities (Counts 1, 7, 11, 12, and 15) for which the City would be vicariously liable or otherwise immune from liability.  (Dkt. 91 at 3.)  Suits brought against officers in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent . . . . " *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 n.55 (1978)).  The court finds that the official capacity claims against the officers are redundant of the claim against the City for municipal liability and serve no proper purpose when the City is a Defendant in the suit.  *See C.P. by and through Perez v. Collier County*, 145 F. Supp. 3d 1085, 1090 (M.D. Fla. 2015).  In response to the City's motion, Plaintiff represents that the claims brought against the officers are in their individual capacities only.  (Dkt. 102 at 2.)  Therefore, the court finds that summary judgment is appropriate to the extent Plaintiff is still pursuing Counts 1, 7, 11, 12, and 15 against the officers in their official capacities as Plaintiff has abandoned these claims.  *See generally Vinson v. Dep't of Corr., Fla.*, 672 F. Supp. 2d 1247, 1261 (N.D. Fla. 2009) (explaining that when a plaintiff abandons a claim at the summary judgment stage, the moving defendant may be entitled to summary judgment as to those claims) (collecting cases).

a) *Monell* **claims – City (Counts 2, 4, and 6)**

A city cannot be held liable under section 1983 on the basis of respondeat superior or vicarious liability. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, a plaintiff must prove a municipal policy or custom that caused a constitutional violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). When the defendant is a local government entity or municipality, the plaintiff can establish section 1983 liability by showing that the defendant acted "pursuant to [an] official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978). Municipal policy can come in different forms. The most common example is the enforcement of an officially endorsed policy, such as an ordinance, rule, regulation, code, or policymaker decision. *See Id.* at 694–95; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, (1988) (plurality opinion). But informal policies and practices may also subject a municipality to liability when they are so well-settled, permanent, pervasive, and wide-spread that they "take on the force of the law." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (internal quotation marks omitted). "[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference' towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)); *see also Connick v. Thompson*, 563 U.S.

51, 61 (2011) (noting that a municipality's culpability "is at its most tenuous where a claim turns on a failure to train").

Ultimately, a municipality will only be held responsible "for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cty. Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 403–04 (1997); *Monell*, 436 U.S. at 694 (explaining that a municipality does not incur section 1983 liability for injuries caused solely by its employees). Further, a municipality will not be liable under section 1983 for random acts, isolated incidents, or customs or practices of which its policymakers were unaware. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986). Therefore, although a custom does not need to receive formal approval, the plaintiff must show actual or constructive knowledge of the custom by a policymaking body. *Id.*

The City argues that Counts 2, 4, and 6 should be dismissed because even if Plaintiff can establish a Fourth Amendment violation, he cannot establish that the officers acted pursuant to a written or widespread informal policy on the day of the incident. (Dkt. 91 at 16–20.) In response, Plaintiff argues that the City has municipal liability as to these counts because (1) the City's Deputy Chief of Police failed to complete an investigation of the use of force employed at the scene in accordance with the Daytona Beach Police Department's (DBPD) Departmental Standards Directives (Directives), (2) the City failed to address training deficiencies since a report was not completed, (3) the City failed to investigate the officers even after a state court judge determined that Plaintiff's rights were violated, and (4) the City failed to train Officer

Mackenzie after completing an internal investigation.  (Dkt. 102 at 12.)  Plaintiff further argues that all of these failures by the City constituted deliberate indifference to the officers violation of Plaintiff's Fourth Amendment rights.  (*Id.*)

The Internal Affairs (IA) log Plaintiff relies upon does not establish a pattern of similar constitutional violations since only two incidents contained in the reports involved alleged unlawful stops by the same DBPD officer, and both complaints were found to have no basis.  (Dkt. 102-3); *see also Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary" to prove a failure to train claim. (internal quotation omitted)); *Brooks*, 813 F.2d at 1193 (finding that ten previous complaints, each of which were investigated and found to be meritless was insufficient evidence that officials should have been aware of past misconduct). *Ott v. City of Mobile*, 169 F. Supp. 2d at 1310–12 (discussing the Eleventh Circuit's requirement that to impose municipal liability for a custom or policy based on widespread practice, the previous incidents must have been meritorious); *compare Griffin*, 261 F.3d at 1308–09 (affirming liability when wide-spread sexual harassment permeated city hall which policymakers ignored and tolerated), *with Brooks*, 813 F.2d at 1193 (denying liability where city investigated all other police misconduct complaints and found them to lack merit).  This case is similar to *Brooks* as the IA log provided by Plaintiff shows that the City investigated the two claims for unlawful stops brought against another DBPD officer and found both complaints meritless.  (Dkt. 102-3.)

Further, based on the IA log, the court finds that two unsubstantiated unlawful stop complaints from 2018–2022 does not constitute a recurring situation in which the City has failed to train its employees. A municipality can be liable for a single incident only where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent." *City of Canton,* 489 U.S. at 390. Municipal liability cannot derive from an "isolated incident" and without evidence of other incidents of unlawful seizure that were substantiated, Plaintiff cannot prove the incident at hand is anything other than isolated. *See Depew*, 787 F.2d at 1499; *Holloway v. City of Orlando*, No. 15-CV-129-ORL-40-GJK, 2016 WL 4369958, at *7 (M.D. Fla. Aug. 16, 2016). Assuming a single municipal employee's actions could form the basis of a ratification claim, Plaintiff would still need to establish that an employee committed a substantial number of constitutional violations of the kind this case concerns, which policymakers knew or should have known about and ignored. *See Brooks*, 813 F.2d at 1193. Plaintiff cannot meet this burden by conclusorily referencing the fact that Officer Tucker had multiple IA investigations absent additional evidence to support this contention.[6] (Dkt. 102 at 14.) Without evidence as to the nature of each IA investigation, Plaintiff cannot establish that Officer Tucker committed a substantial number of unlawful seizures similar in nature to the instant case.

---

[6] Plaintiff refers to "Exhibit 4" in his response to support this contention bu this exhibit is not attached to his response or filed with the court. (*See* Dkt. 101, 101-1, 101-2, 101-3.)

To the extent that Plaintiff asserts that the City's Deputy Chief of Police appearing at the scene after Plaintiff's arrest constitutes a final policymaker's approval of an unconstitutional action (Dkt. 102 at 12), the Deputy Chief of Police did not have final policymaking authority under Florida law. *See Cooper v. Dillon*, 403 F. 3d 1208, 1222 (11th Cir. 2005); Fla. Stat. § 166.049 (declaring that the police chief is to determine police procedure for coordinating communication between law enforcement officers); Fla. Stat. § 870.042(2) (stating that the police chief can declare a state of emergency in the municipality and assume emergency powers).  Finally, to the extent that Plaintiff argues that a person with final policymaking authority ratified the officers' conduct, the record establishes that the City was not aware of any alleged violations prior to the state court judge granting a motion to suppress in Plaintiff's underlying state court claim and that Officer Tucker left the department before the City's investigation of his actions were completed.  (Young Dep., Dkt. 72-9 at 34:25–35:8, 37:1–39:5.)  For these reasons, the court finds that the City cannot be held municipally liable for the officers' actions.  Accordingly, the City's motion is granted as to Counts 2, 4, and 6.

### b)  State law claims – City (Counts 1, 8, 13, and 14)

As an initial matter, the court has concluded herein that the officers are entitled to summary judgment on Plaintiff's state law false arrest claim (Count 1) and Plaintiff's state law invasion of privacy claim (Count 8).  As such, the City is also entitled to summary judgment on these claims.  The court will now discuss the City's arguments as to the remaining claims.

The City argues that Plaintiff's negligence claim (Count 13) should be dismissed because the actions that Plaintiff alleges the officers negligently undertook in the Complaint were intentional, and that negligent commission of an intentional tort is not cognizable.  (Dkt. 91 at 22–23.)  Plaintiff argues that summary judgment should not be granted as to this claim because Defendants owed Plaintiff a duty of care and have failed to demonstrate that they did not breach this duty.  (Dkt. 102 at 16–17.) The court agrees that there is no "such thing as the 'negligent' commission of an 'intentional' tort." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (citing *City of Miami v. Sanders*, 672 So.2d 46, 47–48 (Fla. Dist. Ct. App. 1996).  In the Complaint, Plaintiff alleges that the officers' negligent acts included detaining him, using physical force against him, entering his vehicle, and failing to render aid after the crash. (Dkt. 1-1 ¶ 153.)  All of these acts are intentional.  Further, to the extent that Plaintiff argues that the City negligently engaged in a mode of operations or its regular practice of business, the court finds that this claim comprises a 42 U.S.C. § 1983 failure to train claim couched as a negligence claim.  (Dkt. 102 at 16–17.)  Plaintiff does not provide the court with any authority establishing his ability to maintain this claim. The court has previously found that the record does not support the contention that the City failed to train its officers.  Accordingly, absent any authority to the contrary, and since the court has previously addressed the parties' arguments relating to these allegations, the City's motion is granted as to Count 13.

Finally, as to Plaintiff's state law vicarious liability assault claim (Count 14) the court finds that summary judgment is appropriate as to this claim because (1) it is

duplicative of Plaintiff's other claims that the court has already addressed on the merits and (2) the court finds that Plaintiff abandoned this claim because his response to the City's motion does not contain any argument or supporting authority to substantiate it. (Dkt. 102.) *See generally Vinson*, 672 F. Supp. at 1261 (explaining that when a plaintiff abandons a claim at the summary judgment stage, the moving defendant may be entitled to summary judgment as to those claims) (collecting cases). Accordingly, the City's motion is granted as to Count 14.

**CONCLUSION**

Accordingly, it is **ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Dkt. 72) is **DENIED**.

2. Defendants Tucker and Mackenzie's Motion for Summary Judgment (Dkt. 88) is **GRANTED in part** and **DENIED in part** as follows:

   a. Summary Judgment is **GRANTED** as to Counts 1, 3, 7, 9, 10, and 11.

   b. Otherwise, the Motion is **DENIED**.

3. Defendant the City of Daytona Beach's Motion for Summary Judgment (Dkt. 91) is **GRANTED**.

**ORDERED** in Orlando, Florida, on October 19, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record